USCA1 Opinion

 

 ____________________ No. 94-1593  UNITED STATES OF AMERICA, Appellee, v. PASQUALE G. BARONE, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ____________________ Before Boudin, Circuit Judge, Campbell and Bownes, Senior Circuit Judges. ____________________ Bernard Grossberg for appellant. Cynthia A. Young, Attorney, United States Department of Justice, with  whom  Donald  K.  Stern, United States Attorney, and Jeffrey Auerhahn, Assistant United States Attorney, were on brief for appellee. ____________________ June 6, 1997 ____________________ BOWNES, Senior Circuit Judge. Defendant-appellant Pasquale  G.  "Patsy"  Barone and seven co-defendants were charged in  a  sixty-five-count superseding indictment with a variety of RICO1 and other offenses. The indictment charged Barone with RICO conspiracy in violation of 18 U.S.C. S 1962(d) (Count One); the underlying substantive RICO offense in violation of 18 U.S.C. S 1962(c) (Count Two); conspiracy to commit the murder of Vincent James "Jimmy" Limoli, Jr. in aid of racketeering  (Count Three), and the murder of Limoli in aid of racketeering (Count Four), both in violation of 18 U.S.C. S 1952(B), now codified as amended at 18 U.S.C. S 1959. Because of the pendency of the government's appeal from the district court's ruling in favor of Barone on his motion to suppress certain post-arrest statements, see United States v. Barone, No. 89-289-WF, 1991 WL 353883 (D. Mass. 1. RICO refers to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. SS 1961-1968. The provisions pertinent to this appeal, 18 U.S.C. S 1962 subsections (c) and (d), read as follows: (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section. -2- 2 Aug. 21, 1991), aff'd, 968 F.2d 1378 (1st Cir. 1992), the district  court  ordered  that Barone be tried separately from his co-defendants (who, with the exception of one who was a fugitive at the time, subsequently pleaded guilty). On October 20, 1993, after a nine-week trial, the case was submitted  to  the  jury.   On October 25, and again on October 27, 1993, the district court gave the jury a "modified Allen charge" in response to communications from the jury indicating that it was deadlocked. On October 28, 1993, the district court, acting pursuant to Federal Rule of Criminal Procedure 23(b), dismissed one of the jurors for just cause after  conducting  a  lengthy inquiry into the effect on the juror and the jury of the juror's unsolicited receipt of extra- judicial  information  from a Federal Protective Service Officer. Having determined that the remaining jurors were capable of continuing to deliberate fairly and impartially, the district court exercised its discretion under Rule 23(b) to allow the remaining  eleven  jurors  to deliberate to a verdict, rather than declare a mistrial.  On  October  29, 1993, the eleven-member jury returned verdicts of guilty as to Counts One through Three, but failed to agree as to Count Four, the murder charge. The district court accepted the jury's verdicts as to Counts One through Three and declared a mistrial as to Count Four. On December  20,  1993,  Barone filed a motion for a new trial, which -3- 3 the district court denied on January 25, 1994. United States v. Barone, 846 F. Supp. 1016 (D. Mass. 1994). On April 25, 1994,  the  court sentenced Barone to life imprisonment on Count Three and to twenty years on each of Counts One and Two, with each sentence to be served concurrently with the others. Barone now appeals his conviction. We affirm. I. The superseding indictment charged Barone with agreeing to participate and participating in the following predicate  acts  of  racketeering, see United States v. Saccoccia, 58 F.3d 754, 764 (1st Cir. 1995), cert. denied, --- U.S. ---, 116 S. Ct. 1322 (1996), as an "associate" of the Patriarca Family  of  La  Cosa Nostra (also known as the Mafia; hereinafter "LCN"), alleged to be the RICO enterprise: (i) assault with intent to murder, murder of Anthony "Dapper" Corlito, and conspiracy  to do the same; (ii) assault with intent to murder, murder of Jimmy Limoli on behalf of Vincent M. "Vinnie" Ferrara,  and  conspiracy to do the same; and (iii) assault with intent  to  murder Social Services Credit Union ("credit union") security guard Kenneth McPhee, assault with intent to rob Kenneth McPhee and credit union employee Lucy LoPriore, and robbery of Lucy LoPriore of property belonging to the credit union. The indictment also charged Barone with a number of overt acts of the racketeering conspiracy.  -4- 4 We summarize the facts relating to these predicate acts,  insofar as relevant to the issues raised in this appeal, taking the evidence as the jury could permissibly have found it, and viewing the record and drawing all reasonable inferences  in  the  light  most favorable to the government. See, e.g. ,  United  States v. Zannino, 895 F.2d 1, 4 (1st Cir. 1990). The testimony of expert and cooperating witnesses established the existence, structure, and nature of the Patriarca Family -- as an organized "enterprise" within the meaning of 18 U.S.C. S 1961(4), conspiring to and engaging in loansharking, bookmaking, drug trafficking, extortion, murder, obstruction of justice, and other illegal activity -- and Barone's  activities  and  relationships to others as an associate of the Patriarca Family. See generally United States v. Angiulo, 847 F.2d 956, 973-75 (1st Cir. 1988) (allowing FBI agent to testify as an expert regarding the structure and operations of the Patriarca Family of LCN, and the nature of the defendants' relationships to the organization).  In the early 1980s, the Patriarca Family was run by boss Raymond Patriarca, Sr., underboss Gennaro "Gerry" Angiulo, consigliere Vittore Nicolo Angiulo, and capo regimes including Donato F. "Danny" Angiulo, Samuel S. Granito, and Ilario  M.A.  Zannino. When Raymond Patriarca, Sr. died in July 1984,  Raymond  Patriarca,  Jr. became the boss and William Grasso became the underboss. In the late 1970s and early 1980s, -5- 5 Vincent Ferrara was an associate of the Patriarca Family assigned to the regime of Danny Angiulo. In 1983, Ferrara became  a  "made member" and soldier in Danny Angiulo's regime.2 Barone and his close friend Limoli were associates of the Patriarca Family who both wanted to become "made members" of the organization, and who began their efforts to accomplish this goal by selling illegal fireworks for Ferrara in the 1970s. Walter Anthony Jordan (hereinafter "Jordan") testified for the government at Barone's trial. He and his brother Chris Jordan were also associates of the Patriarca Family. Jordan met Barone and Limoli in late 1981 or early 1982. Barone later married Jordan's sister Kim. Limoli was Barone's  best  man  at  the  wedding and became godfather to Barone and  Kim's  child. Beginning in the summer of 1984, Jordan sold illegal  fireworks,  giving the money from the sales to Limoli or Barone. Jordan testified that Barone told him that all the 2. According to the government's evidence, an LCN family is headed by a "boss," with an "underboss" as second in command.  The official counselor or advisor to the family is known as the "consigliere." Below the underboss are "capo regimes," or captains of the LCN family. Assigned to each capo regime are "soldiers," who are "made members" of the family. An individual who has been nominated for membership in the family is a "proposed member," and an "associate" is one who, although not a "made member," works for or performs services for the family. Members and associates are required to obey their superiors in the family, to obtain permission from their superiors before engaging in criminal activity, and to commit criminal acts, including murder, as directed by their superiors.  -6- 6 money from these sales went to Ferrara, with Barone receiving a percentage, along with Ferrara's loyalty. Jordan also testified that Barone told him that he needed Ferrara's permission  in order to commit any illegal activities, and that he was "under [Ferrara's] wing," and would be a "made member" of the Patriarca Family one day, moving up in the ranks with Ferrara.  One  of  the  predicate acts of racketeering with which Barone  was  charged  is  the murder of Anthony Corlito, who, along with Giacomo A. "Jackie" DiFronzo and others, was a member of a rival North End gang. Jordan testified that Ferrara and DiFronzo "didn't get along" because DiFronzo had "ripped off" the Angiulos' North End card games during the late 1970s. Elizabeth  DiNunzio,  Limoli's sister, testified that Limoli told her that Gerry Angiulo hired Ferrara -- who then enlisted the aid of Limoli -- to kill DiFronzo because DiFronzo "had a bad drug problem" and "was robbing all the people in the North End." DiNunzio testified that Limoli told her that, on December  11,  1977, after fighting with DiFronzo at an Endicott Street club, Ferrara shot DiFronzo in the head; that Limoli thereafter  kicked  DiFronzo in the head; and that the two placed DiFronzo in a chair and set the chair and the club on fire. Jordan testified that Corlito swore vengeance on Ferrara for the murder of DiFronzo, and that Corlito was murdered by Ferrara, Limoli, and Barone on July 21, 1979. -7- 7 According to Jordan, Barone told him that he, Limoli, and Ferrara came upon Corlito and his girlfriend on Fleet Street and  started  shooting  at  Corlito. After Ferrara left the scene, Limoli  continued to fire at Corlito and Barone urged Limoli to leave. Eventually, Barone and Limoli ran to Hanover Street, where they got into a car and drove off. DiNunzio testified that  Limoli  told  her  that Ferrara paid Limoli and Barone $1,000 each for killing Corlito. Another racketeering offense with which Barone was charged  is  the November 5, 1982 robbery of credit union teller Lucy  LoPriore  of  a  bag  of cash belonging to the credit union as she and security guard Kenneth McPhee walked from the First National Bank on Hanover Street to the credit union at the corner of Parmenter and Salem Streets in the North End. According  to  witnesses, the robbery occurred between 10:00 and 10:30 a.m. and was perpetrated by two masked men. In the course of the robbery, McPhee was shot in the calf and in the neck. The owner of a Salem Street hardware store saw Limoli run down Salem Street from Parmenter Street.  Jordan testified that Barone told him that he and Limoli were responsible for the robbery and that Barone had shot the security guard in the neck. Barone said that the stolen cash amounted to $30,000, with Ferrara taking $15,000, and Limoli and Barone splitting the rest between them.  -8- 8 DiNunzio  testified  that,  on the morning of the credit union robbery, Limoli came to her house carrying a box and asked her for lemon juice, saying that if you wash your hands with lemon juice, "they can't tell that you shot a gun." According to DiNunzio, after the robbery was reported on the noontime news, Limoli admitted to her that he and Barone had committed the robbery; that he had shot security guard McPhee in the foot; and that Barone had shot McPhee in the neck. DiNunzio testified that Barone and Chris Jordan later joined Limoli  at  her house, at which time Barone admitted that he had shot the guard in the neck. Barone was also charged with the murder of Limoli, which had its origins in a plan hatched by Limoli and Frank Salemme,  Jr.  to commit another in a series of "drug rip-offs," executed by passing off wood chips or peat moss as marijuana. Jordan  and  DiNunzio  testified that in the spring of 1985, while Limoli was in Florida, Salemme, Jr. and others, including Walter Jordan, went ahead with the planned rip-off scheme, although Limoli had asked Salemme, Jr. to wait for him to return to town before "doing the deal." When Limoli learned that  Salemme, Jr. and his cohorts had completed the rip-off by delivering peat moss in exchange for a $100,000 down payment, he  vowed  to  get even with Salemme, Jr. for cheating him out of $35,000. -9- 9 Jordan testified that in September of 1985, Barone told him that Limoli had stolen a bag containing cash and $100,000  worth  of  cocaine that he believed belonged to Salemme, Jr., but which actually belonged to Antonio L. "Spucky" Spagnolo, a Patriarca Family soldier. According to Jordan, Barone  told  him that Limoli gave $30,000 of the stolen cash to Barone and that Barone kept the cash in his freezer until the cash  and  cocaine were eventually returned. DiNunzio testified that Limoli told her that he took the bag to his girlfriend Lena Chiuchiolo's house; that he was seen with the bag by Lena's sister Annette, who was Salemme, Jr.'s girlfriend; and that  Annette  told  Salemme, Jr. what she had seen. According to DiNunzio, Limoli told her that the story of his theft of the bag  eventually reached Spagnolo, the true owner of the bag, as well as other, high-level Patriarca Family members.  Limoli  told  DiNunzio  that he was questioned about the incident in separate meetings with Samuel Granito and Frank Salemme, Sr., and during an alleyway "meeting" with Salemme, Jr.,  Danny  Angiulo, Ferrara, Spagnolo, and Peter "Doc" Limone. Limoli told DiNunzio that, in the course of the alleyway meeting, he repeatedly denied taking the bag, but eventually admitted  it  when  he  was  told that Annette had seen him with the bag  and  had  told  Salemme, Jr. about it. According to DiNunzio, Ferrara told Limoli, "I could whack you right here," but "[w]e'll forget about it and let's go on from here." Limoli -10- 10 told  DiNunzio  that  "that's not the way the guys work," and that he knew that they were going to kill him. Jordan testified that Barone told him that, because he  had  stolen  from  a  made member of the LCN, "Jimmy got the X," meaning  that  he  (Limoli)  would no longer be permitted to engage in LCN activities. A week or two later, Barone told Jordan that Ferrara had ordered Limoli killed because of this incident.   According  to  Jordan, he was with Barone when Ferrara called  Barone  at  home  on  the evening of October 28, 1985 to say that  Limoli  had  to  be  killed. On Barone's instructions, Jordan called Limoli to set up a deal involving the sale of drugs, with a meeting to take place at about 8:00 p.m. that night at D'Amore's Restaurant in the North End. The two then left Barone's  house, each carrying gloves and Barone carrying a .38 caliber revolver.  Jordan testified that, on Barone's instructions, he called  Limoli at D'Amore's from the nearby European Restaurant before the two went to meet him. When they arrived at D'Amore's, Jordan went inside to get Limoli, and when Limoli came  out  of  the restaurant and saw Barone, he told Jordan that he  had  wanted him to come alone. Limoli then talked privately with Barone, after which he returned to the restaurant while Barone  and  Jordan  left  to retrieve Barone's car, which they had parked elsewhere. When Barone and Jordan returned to -11- 11 D'Amore's,  Limoli left the restaurant and got into the waiting car, which then drove off, with Jordan driving.  Maureen Karpowicz-DiPietro, Limoli's cousin, testified that, shortly after 8:00 p.m. on October 28, 1985, she and a friend went with Limoli to D'Amore's, where Limoli received a telephone call and then a visit from Jordan. According  to  Karpowicz-DiPietro, Limoli met Jordan outside the restaurant and apparently became angry when he saw Barone. Limoli yelled at Jordan but then talked privately with Barone before returning to the restaurant. Jordan and Barone then left, returning to D'Amore's shortly after 10:00 p.m. in Barone's car. Karpowicz-DiPietro testified that Limoli put a cloth napkin in a brown paper bag, said "that will do it," asked her to meet him later, and then left the restaurant to join Barone and Jordan. DiNunzio testified that Limoli told her that he was going to rob Barone and Jordan that night.  Jordan testified that, after he parked the car next to the cemetery at the intersection of Snowhill and Hull Streets, the three men got out of the car. According to Jordan, Barone shot Limoli in the back of the head at about 10:25  p.m.  as  the  three  men walked up Hull Street. When Limoli fell to the ground, Jordan grabbed the brown paper bag that Limoli was carrying and then ran back down Hull Street with Barone.   After they crossed Snowhill Street, Jordan discovered that the bag contained only cloth napkins. Jordan testified -12- 12 that, after the discovery, Barone ran back up Hull Street, followed by Jordan, and that when he reached Limoli, Barone leaned  over  him, shouted "Why, Jimmy?" and fired the remaining bullets into Limoli's head. Barone then directed Jordan to search Limoli's body for money, which Jordan did, finding and taking  a  wad  of  $100  bills and a .45 caliber gun, both of which he gave to Barone. At this point Barone said, "Walter, let's go," and the two began running back down Hull Street, eventually  arriving  at  Barone's house. While there, Barone put the murder weapon into a plastic garbage bag, along with his clothes  and  Jordan's clothes. The next day, Barone and Jordan walked out onto a pier with the bag and the gun and Barone threw them both into Boston Harbor.  II. Barone argues that Limoli's out-of-court statements were  inadmissible hearsay and that the district court erred by admitting them over his objection through the testimony of Maureen Karpowicz-DiPietro and Elizabeth DiNunzio. The district  court admitted the hearsay testimony largely pursuant to Federal Rule of Evidence 804(b)(3), which creates an exception to the hearsay rule for statements against the declarant's interest, including penal interest.  Barone argues that the statements were inadmissible under  Rule  804(b)(3)  because they were (i) not against Limoli's penal  interest; (ii) not sufficiently corroborated by properly -13- 13 admitted independent evidence; and (iii) inadmissible under Williamson v. United States, 512 U.S. 594 (1994), which was decided while Barone's appeal was pending, because the statements  are not individually self-inculpatory. Barone also objects to the admission of Limoli's statements on constitutional grounds, arguing that the introduction of this evidence  violated his rights under the Confrontation Clause of the Sixth Amendment.  A. 1. The out-of-court statements of a non-testifying declarant ordinarily are excluded as hearsay if offered to prove the truth of the matter asserted. See, e.g., United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993). The rule against hearsay reflects concerns about the trustworthiness of out-of-court statements, arising from the fact  that  such  statements are not subject to the tests normally applied to in-court testimony to ensure its reliability. Exceptions to the hearsay rule permit courts to admit certain hearsay statements that bear indicia of reliability and trustworthiness sufficient to overcome these concerns. One such exception is Federal Rule of Evidence 804(b)(3), which provides that, if the hearsay declarant is unavailable  to  testify  as an in-court witness (a point which is not in dispute here), the hearsay rule does not exclude -14- 14 A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in the declarant's position  would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless  corroborating circumstances clearly indicate the trustworthiness of the statement. Barone  moved  in  limine  to exclude Limoli's statements from  DiNunzio's testimony, arguing, as he does on appeal, that the statements do not meet the "against interest" and "corroborating circumstances" requirements of Rule 804(b)(3), and that the admission of these statements would violate his confrontation rights. Barone raised no objection in limine to the testimony of Karpowicz-DiPietro.  The district court ruled from the bench that DiNunzio's proposed testimony regarding what Limoli told her about his criminal activities, including those activities undertaken with Barone and others, was admissible under Rule 804(b)(3) as interpreted by this court in United States v. Seeley ,  892  F.2d 1 (1st Cir. 1989), and that admission of this testimony would not violate the Confrontation Clause. The court found that Limoli was unavailable; that his statements regarding his participation in crimes on behalf of the Patriarca Family were against his penal interest; and that sufficient corroboration and indicia of reliability attended -15- 15 the making of the statements. The court also ruled that Federal Rule of Evidence 403 did not operate to exclude the disputed evidence. The district court found that the context and circumstances in which the hearsay statements were made demonstrated  their trustworthiness and reliability. The court reasoned that Limoli had made the statements to a person (DiNunzio) with whom he had a very close relationship, rather than to the police, and that he therefore had no motive to curry  favor  with law enforcement officials and no incentive to diminish his role in the criminal activity described in the statements  by  shifting  blame to Barone or to others. The court also  found  that the detailed nature of the statements, the in- court  testimony  of  Walter Jordan and others, and other evidence (e.g., evidence lawfully obtained through electronic surveillance) satisfied the corroborating circumstances requirement  of Rule 804(b)(3) and supplied the "particularized guarantees of trustworthiness" required by the Confrontation Clause. In addition, while noting that, under Seeley, DiNunzio's credibility was not part of the admissibility analysis but was a question for the jury, the district judge nevertheless  found  that  DiNunzio had no reason to cast blame on Barone or to exculpate herself.  The court recognized that DiNunzio arguably could have  been  motivated to fabricate testimony by a desire to seek -16- 16 revenge for her brother's murder, but found it to be unlikely that someone who grew up in the North End, as DiNunzio did, would falsely accuse Ferrara (who was well known and widely reputed  to  be a dangerous Mafia killer) or his associates, and that DiNunzio related to law enforcement authorities the essential elements of the challenged testimony before Barone and  Ferrara  were apprehended. The court concluded that issues such  as  DiNunzio's  possible motive to fabricate ultimately went to her credibility (a jury question), rather than to the trustworthiness of the hearsay statements (a question of admissibility  of  evidence to be decided by the court), and that DiNunzio could be cross-examined on these matters. The  district  judge  concluded his ruling by cautioning that,  although  he  would  admit the testimony generally, it would be  necessary  to "go statement by statement to see if there are parts of it that are inadmissible." 2. Before proceeding to our analysis of Barone's evidentiary challenge, we must iron out a few wrinkles concerning the extent to which Barone may be deemed to have preserved the issue for appeal, and the related question of what standard of review under Federal Rule of Criminal -17- 17 Procedure 52 -- harmless error or plain error -- should be applied to this issue on appeal.3  At  trial,  Barone  objected at the outset of Karpowicz- DiPietro's testimony (without stating the grounds), and this objection led to a side-bar conference that included a discussion of the admissibility of Limoli's statements as declarations against penal interest. After hearing the government's  outline  of  Karpowicz-DiPietro's proposed testimony and  briefly  entertaining  argument by both parties, the district court ruled that Limoli's statements were admissible as declarations against penal interest, but that his statements regarding what Ferrara reportedly said to him would not be allowed. Barone made no further hearsay objection to Karpowicz-DiP ietro's testimony, and failed altogether to renew his objection to the admission of Limoli's statements through DiNunzio's testimony, although he objected several times on other grounds. We find Barone's contemporaneous objection to Karpowicz-DiPietro's  test imony to be sufficient to preserve the 3. Federal Rule of Criminal Procedure 52 provides as follows: (a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. (b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. -18- 18 hearsay  objection as to her testimony, and therefore the issue is subject to harmless error review under Federal Rule of Criminal Procedure 52(a). The question whether Barone's objection  was properly preserved as to DiNunzio's testimony is a different matter, however, because Barone did not, as our case law requires, renew his hearsay objection at trial.4  We have repeatedly held that a "motion in limine without  subsequent,  contemporaneous objection at trial . . . is ordinarily insufficient to preserve an evidentiary ruling for appeal," and that, absent a timely objection at trial, our review  is  solely  for  plain error under Federal Rule of Criminal Procedure 52(b). United States v. Reed, 977 F.2d 14, 17 (1st Cir. 1992). See United States v. Lombard, 72 F.3d 170, 189 (1st Cir. 1995). Our case law thus directs that Barone's objection  to  DiNunzio's  testimony ordinarily would be deemed to have  been  forfeited  and  therefore reviewable on appeal only for plain  error.  But the question whether harmless or plain error applies is more difficult here than in the ordinary case because Barone's challenge in this court is based, in part, upon the narrowing interpretation of Rule 804(b)(3) set forth 4. Barone asserts that DiNunzio's testimony as to Limoli's statements was admitted over his objection, citing his motion in limine to limit or exclude this testimony. Barone does not direct our attention to any hearsay objection to DiNunzio's testimony at trial and our review of the transcript reveals none. -19- 19 in  Williamson v. United States, 512 U.S. 594 (1994), which was decided while this appeal was pending.  It  seems  clear  that  Barone benefits from the new rule announced in Williamson because direct review was pending at the  time  it  was  decided.  See Johnson v. United States, No. 96- 203, 1997 WL 235156, *5 (U.S. May 12, 1997); Griffith v. Kentucky, 479 U.S. 314, 328 (1987); Hines v. Davidowitz, 312 U.S.  52,  60  (1941); United States v. Melvin, 27 F.3d 703, 706- 07 n.4 (1st Cir. 1994). Less clear is whether Barone's forfeited hearsay objection -- to the extent that it turns on the application of the rule announced in Williamson -- is subject  to  harmless  error or plain error review. After all, it seems unfair to fault Barone for failing to raise at trial an objection  based upon a rule that was not announced until after the  trial  was  concluded.  See United States v. Collins, 60 F.3d 4, 7 (1st Cir. 1995). The question of what standard applies "where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified" was specifically reserved by the Supreme Court in its explication of  the  plain  error  standard in United States v. Olano, 507 U.S. 725, 734 (1993). In the recently decided Johnson v. United States ,  1997  WL 235156, however, the Supreme Court applied the Olano plain error test where the petitioner failed timely to object at trial, based upon a right announced in United -20- 20 States v. Gaudin, 515 U.S. ---, 115 S. Ct. 2310 (1995), which was decided while his case was pending on direct appeal. Olano  holds  that, in order for an appellate court to correct an error not raised at trial, it must first find that there is "'error' that is 'plain' and that 'affect[s] substantial rights.'" 507 U.S. at 732. When these three elements are satisfied, an appellate court may exercise its discretion to correct the error under Rule 52(b) only if the forfeited error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 736 (quoting  Unit ed States v. Atkinson, 297 U.S. 157, 160 (1936)). In Johnson, the Court concluded that the petitioner was entitled to the retroactive application of the new rule announced in Gaudin, and therefore that the "error" prong of the Olano test was satisfied. Johnson, 1997 WL 235156, at *5 (citing  Griffith  v.  Kentu cky, 479 U.S. at 328). The Court then held  that  "in a case such as this -- where the law at the time of trial was settled and clearly contrary to the law at the time  of  appeal -- it is enough that an error be 'plain' at the time of appellate consideration," and that, by this analysis, the Gaud in error met the "plain" prong of the Olano test. Johnson ,  1997 WL 235156, at *6. Without deciding the question whether the error had affected the petitioner's substantial rights -- the third prong of the Olano test -- the Court declined to notice the error under Rule 52(b) on the ground -21- 21 that, even assuming that the "substantial rights" prong was satisfied, there was no basis for concluding that the error "seriously affect[ed] the fairness, integrity or public reputation  of judicial proceedings." Johnson, 1997 WL 235156, at *7. Although Johnson does not purport to do so, the conclusion  appears  to  us  to be inescapable that Johnson answers the  question  left open in Olano and that, under Johnson, plain error  review  applies in the circumstances presented here, even to the extent that the resolution of Barone's challenge to DiNunzio's testimony turns on the application of the rule of Williamson. In all events, our review leads us to conclude that  Barone's  challenge  would not have succeeded even under the harmless error standard because we find that, to the extent that  the  district court erred in admitting hearsay evidence -- under Williamson or otherwise -- the error(s) did not affect the  outcome  of  the  trial, and therefore did not affect Barone's substantial rights. See Olano, 507 U.S. at 734; United States  v.  Marder ,  48  F.3d 564, 571 (1st Cir.), cert. denied, -- - U.S. ---, 115 S. Ct. 1441 (1995). 3. In Williamson v. United States, the Supreme Court clarified the scope of Rule 804(b)(3) for statements that inculpate the defendant as well as subject the declarant to criminal liability. At issue in Williamson was the -22- 22 admissibility of hearsay statements made by the declarant Harris,  who  had been arrested after police found large amounts of cocaine in the car he was driving, and who made statements to  a  DEA  agent  while  in  custody that indicated that the cocaine belonged to Williamson. 512 U.S. at 596-97.  The Court first considered the question of what is meant by "statement" in light of the principle that "Rule 804(b)(3)  is  founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." 512 U.S. at 599. Reasoning that this principle points clearly to a narrow definition of "statement"  as  "a  single  declaration or remark," rather than to a broad definition as "a report or narrative," id., the Court concluded as follows: In our view, the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements,  even if they are made within a broader narrative that is generally self- inculpatory. The district court may not just  assume  for purposes of Rule 804(b)(3) that a statement is self-inculpatory because  it  is part of a fuller confession, and this is especially true when the statement implicates someone else. 512 U.S. at 600-01. The  Court  explained  that  "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that  a  statement is collateral to a self-inculpatory statement -23- 23 says nothing at all about the collateral statement's reliability." 512 U.S. at 600. Thus, the Rule 804(b)(3) inquiry "is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." 512 U.S. at 603-04 (quoting Fed. R. Evid. 804(b)(3)) (footnote omitted). At oral argument, counsel for Barone characterized Williamson as standing for the proposition that statements against  interest  that  implicate anyone other than the declarant are not admissible under Rule 804(b)(3), arguing that "a statement  that shifts the blame to another person has no basis for  reliability and should not be admissible under the hearsay exception." While it is probably true in the ordinary case that a statement that shifts blame to another should be regarded as unreliable, we do not accept Barone's contention that  Williams on creates a per se bar to any and all statements against interest that also implicate another; nor do we find that any of the hearsay challenged here shifts blame from the declarant Limoli to anyone else.  Far from adopting a per se rule against statements inculpating another, the Court stated that a totality of the circumstances test should be applied to the particular -24- 24 statement at issue in order to determine whether it comports with  the  rationale  upon  which Rule 804(b)(3) is premised -- the assumption that declarations against interest are reliable because people do not make such statements unless believing them to be true. 512 U.S. at 603-04. A statement against penal  interest  is  not  rendered inadmissible "merely because the declarant names another person or implicates a possible codefendant." Williamson, 512 U.S. at 606 (Scalia, J., concurring); see id. at 603. Indeed, the Court used as an example  of  an admissible statement against penal interest "Sam and I went to Joe's house," 512 U.S. at 603, a statement that clearly implicates a person other than the declarant.5  In addressing the issue under the Confrontation Clause, the Second Circuit has held that a statement inculpating both the declarant and the defendant may be sufficiently  reliable as to be admissible in the circumstances that  obtain  here  --  i.e., where the statement is made in a non- custodial  setting to an ally, rather than to a law enforcement official, and where the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that this portion of the statement is any less trustworthy than the portion that inculpates the 5. The Court reasoned that this statement "might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy." 512 U.S. at 603. -25- 25 declarant. See United States v. Sasso, 59 F.3d 341, 349 (2d Cir. 1995); United States v. Matthews, 20 F.3d 538, 546 (2d Cir. 1994). We find this reasoning to be persuasive and equally applicable to a Rule 804(b)(3) analysis of the reliability of the statements challenged here.  Finally, applying Williamson's instruction that courts must determine the admissibility of statements by evaluating them in context and in view of all the circumstances,  512  U.S.  at 603-04, we find that Barone's blame- shifting concerns are not implicated here because none of the challenged testimony shifts blame or exculpates either the declarant Limoli or the defendant Barone. And, to the extent that  any  of  the  challenged statements may be so read, the force of  the  argument  is  blunted by the fact that the statements were not made to law enforcement officials in a custodial setting, as  in  Williamson  (and  as  in nearly all of the cases relied upon by  Barone),  but to close relatives of the declarant. On these facts,  it  cannot  seriously be argued that any of the challenged statements  implicate  the  primary concern raised by Barone, that they  were  intended  to  shift the blame for criminal conduct from the declarant Limoli to another or to curry favor with law enforcement officials.  4. We now consider the testimony to which Barone objects, bearing in mind the following additional standards. -26- 26 First, the district court's construction of evidentiary rules is a question of law which we review de novo. See United States v. Omar, 104 F.3d 519, 522 (1st Cir. 1997); see also United States v. Costa, 31 F.3d 1073, 1077 (11th Cir. 1994) (the  question whether a statement is against penal interest is a question of law, reviewable de novo). Second, the application of an evidentiary rule to particular facts "is normally tested by an 'abuse of discretion' standard, which favors the prevailing party." Omar, 104 F.3d at 522. See United  States v. Houlihan, 92 F.3d 1271, 1297 (1st Cir. 1996), cert.  denied ,  ---  U.S.  ---, 117 S. Ct. 963 (1997). Finally, we may affirm the district court's evidentiary rulings on any ground apparent from the record on appeal. See United States v.  Alzanki ,  54  F.3d  994,  1008 (1st Cir. 1995), cert. denied, -- - U.S. ---, 116 S. Ct. 909 (1996). Barone contends that the district court abused its discretion in admitting Limoli's statements to DiNunzio and Karpowicz-DiPietro regarding his criminal associations and activities during the 1970s and 1980s because the testimony does not meet the requirements for admission under Rule 804(b)(3). Barone does not object to particular statements, but complains generally that the statements were not against Limoli's  penal interest, and that the "rambling narratives" of DiNunzio and Karpowicz-DiPietro contained statements that are -27- 27 inadmissible  under  Willia mson because they are not individually self-inculpatory.  At trial, the district court did not admit the hearsay  testimony  of  these witnesses statement by statement, as Williamson would seem to direct; nor did Barone object statement by statement.6 Nevertheless, our review of the record leads us to agree with the government that the vast majority of the challenged testimony was admissible under the declarations  against  interest exception; that other portions of the testimony were admissible under other hearsay exceptions, or  as  the  personal  knowledge of the in-court witness; and that, to  the  extent  that  the  district court erred in admitting any of the challenged testimony, the error(s) did not affect the 6. In his ruling on Barone's motion in limine, the district judge stated that he would deal with the admissibility of the disputed testimony "statement by statement to see if there are parts of it that are inadmissible," an approach that is fully consistent with Williamson. During the colloquy with counsel that followed his ruling, the judge also invited Barone's counsel to object to specific portions of DiNunzio's proposed testimony, which Barone's counsel declined to do, given the court's ruling on the motion. During this colloquy, the judge also stated, however, that "the mere fact that some of this comes in doesn't mean everything comes in.  But if they're the same conversation and . . . they tend to corroborate even though they're not in isolation against his penal interests, I'll let them in," an approach that is consistent with this court's precedents at the time of the ruling, see United States v. Barrett, 539 F.2d 244, 252-53 (1st Cir. 1976), but facially inconsistent with Williamson.  -28- 28 outcome  of  the  trial  and  so did not affect Barone's substantial rights.7 As to Barone's contention that the district court violated Williamson and abused its discretion in admitting Karpowicz-DiP ietro's testimony recounting what Limoli told her about the events that ultimately led to his murder, we agree with the government that any portions of the testimony that were not admissible as declarations against Limoli's penal interest were otherwise admissible because they fall within another  hearsay exception (e.g., Rule 803(3)), or because they are  not  hearsay  at  all,  but rather reflect Karpowicz-DiPietro's personal knowledge. As to DiNunzio's testimony regarding the murder of Jackie  DiFronzo,  Barone  asserts that Limoli's confession to the murder is the only statement against his penal interest. The government responds that Limoli's statements regarding why DiFronzo was killed, on whose orders, and his statement that Ferrara had enlisted Limoli's help are also declarations against  Limoli's penal interest vis-a-vis the Patriarca Family conspiracy to engage in a pattern of racketeering. The 7. The government does not argue that Barone's objection to DiNunzio's testimony was forfeited for failure to renew at trial the objection he made in limine, but assumes that our review is under the harmless error standard. The government asserts throughout that any error in admitting the hearsay testimony was harmless beyond a reasonable doubt, employing the formulation of the standard applied to issues of constitutional dimension.  -29- 29 government argues that the statements demonstrate Limoli's relationships to Ferrara, Angiulo, and the Patriarca Family hierarchy, as well as Limoli's participation and position in the RICO enterprise; and that Limoli's statements link him to Ferrara  and  Angiulo,  thereby inculpating him in a conspiracy to kill DiFronzo as part of a pattern of racketeering in association with the Patriarca Family. We conclude that Limoli's statements regarding DiFronzo's  murder were admissible under Rule 804(b)(3). These statements  are against Limoli's penal interest insofar as they inculpate  him in criminal acts and conspiracies with others to commit criminal acts. See United States v. York, 933 F.2d 1343, 1360 (7th Cir. 1991); United States v. Layton, 720 F.2d 548, 560 (9th Cir. 1983). Moreover, to the extent that the statements implicate Limoli in the Patriarca Family and its activities, they demonstrate "an insider's knowledge" of a criminal enterprise and its criminal activities, which is sufficiently  against  Limoli's penal interest to come within the exception. See United States v. Barrett, 539 F.2d 244, 252 (1st Cir. 1976); Williamson, 512 U.S. at 606-07 (Scalia, J., concurring). Finally, all of the statements that inculpate Ferrara also directly inculpate Limoli -- e.g., "And he proceeded to go and tell me that it was Vinnie Ferrara and himself had shot him and they said they set the club on fire, the club on Endicott Street." Accordingly, we conclude that -30- 30 the district court's admission of these statements did not violate the rule of Williamson. See Williamson, 512 U.S. at 603-04.  As to DiNunzio's testimony regarding the murder of Corlito, Barone argues that the only statements against Limoli's  penal interest are that he killed Corlito and that he was paid to do so. The government counters that there was nothing in Limoli's confession implicating Barone that might have decreased Limoli's own criminal liability, thereby detracting  from  the  self-inculpatory nature of his admission to DiNunzio that he murdered Corlito. In addition, Limoli's statement  that  Barone  also received $1,000 from Ferrara for his participation in Corlito's murder demonstrates Limoli's knowledge  of  and  participation in the Patriarca Family, and the RICO conspiracy generally, and in the conspiracy to murder Corlito. The government also contends that, even if this statement  is  judged to be insufficiently self-inculpatory, the admission of the statement was harmless beyond a reasonable doubt. For the reasons stated in our consideration of the testimony concerning the DiFronzo murder, supra, we conclude that  the  testimony regarding the Corlito murder was admissible under Rule 804(b)(3), and that any Williamson error in admitting  Limoli's  statement regarding the payment of $1,000 to Barone did not affect Barone's substantial rights. As is the case with his statements regarding the DiFronzo murder, -31- 31 Limoli's statements inculpating Ferrara and Barone in the murder of Corlito also directly inculpate himself.  Barone's  objections  to  DiNunzio's testimony regarding the credit union robbery are that only Limoli's statements admitting  to  the  robbery  and to shooting McPhee in the foot are against his penal interest, and that his statement to the effect that Barone shot McPhee in the neck was inadmissible. The  government replies that DiNunzio's testimony regarding the robbery was otherwise admissible as DiNunzio's personal knowledge.   As  to  Limoli's statement that Barone shot McPhee in the neck, the government argues that, although the statement may appear to shift the blame from Limoli to Barone for the more serious offense of attempted murder, the statement is no less  an  admissible declaration against interest; it inculpates both Limoli and Barone because the shooting was within the scope  of  the  robbery conspiracy, and the statement was made to an ally in a non-custodial setting. Finally, the government argues  that,  even  if  the  admission of this statement was error, it  was  harmless  beyond  a  reasonable doubt in view of DiNunzio's testimony that when Barone and Chris Jordan came to her house after the robbery, Barone admitted that he had shot McPhee in the  neck,  and  in  light  of Walter Jordan's testimony that Barone made the same statement to him. We  conclude  that  the  bulk of DiNunzio's testimony was independently admissible as DiNunzio's personal knowledge, and -32- 32 that the evidence implicating Barone in the robbery and that Barone shot the guard in the neck was als r indicating o independently admissible through the testimony of Walte Jordan. We also find that, to the extent that Limoli's statement regarding Barone may be understood to raise any blame-shifting concerns, we are satisfied that the circumstances in which the statement was made demonstrate that the  portion  inculpating Barone is no less trustworthy than the portion inculpating Limoli. See Sasso, 59 F.3d at 349; Matthews, 20 F.3d at 546.8  Barone challenges the admission of DiNunzio's testimony regarding events and circumstances related to Limoli's "problem" and "big mistake" in having stolen cocaine and  money  from Spagnolo (which he thought belonged to Salemme, 8. For all the reasons stated thus far, we also reject Barone's more general arguments that Limoli's statements concerning his relationships with Ferrara, Barone, Jordan, and others were inadmissible because they shift the majority of the blame for certain activities from Limoli to others -- e.g., Ferrara ordered Corlito's murder. Limoli's statements concerning his relationship with Ferrara are against his penal interest, directly inculpating him in a RICO conspiracy with Ferrara (and Barone) and in the RICO enterprise, along with other criminal activities. DiNunzio's hearsay testimony that Limoli was involved in criminal activities with Barone and with Chris and Walter Jordan is also against Limoli's penal interest, particularly in view of Walter Jordan's testimony that he, Limoli, and Barone together were engaged in criminal activity in association with the Patriarca Family. Although, as the government concedes, Limoli's statements regarding Barone's criminal activities with Jordan should not have been admitted because they do not inculpate Limoli, the error did not affect Barone's substantial rights as Jordan himself testified about his criminal activities with Barone.  -33- 33 Jr.), and to the drug deal between Limoli and Barone that was to take place the night Limoli was murdered. Barone contends that  a  "mistake" cannot be classified as a declaration against penal interest, and that there was no reasonable likelihood that Limoli's statements regarding, inter alia, the Prince Street alley meeting and the drug deal with Barone could have resulted in criminal liability. The government responds that Limoli's statements regarding his "big mistake" and related events  were  admissible  under Rules 803(3) and 804(b)(3) because they reflect Limoli's then state of mind; demonstrate his knowledge  of  the workings of the Patriarca Family; incriminate him  in  the  possession  of  narcotics and in a theft of money; and inculpate  him  in  the  Patriarca Family and RICO conspiracy. The government  contends further that Limoli's statements regarding his recognition of the mistake -- violating the LCN rules by stealing from a made member -- and how the Patriarca Family responded to it demonstrate Limoli's knowledge of and involvement with the Patriarca Family.  We conclude for the reasons already stated that Limoli's statements regarding his "big mistake" and his resultant  "problem"  are  sufficiently against his penal interest as  to  be  admissible. See, e.g., Barrett, 539 F.2d at 252. We further find that the circumstances surrounding the making of these  statements demonstrate their self-inculpatory nature and that a reasonable person in Limoli's position would not have -34- 34 made such statements unless he believed them to be true. See Williamson, 512 U.S. at 603 (explaining that "whether a statement  is  self-inculpatory or not can only be determined by viewing  it  in  context,"  and that "[e]ven statements that are on their face neutral may actually be against the declarant's interest").  In this regard, the government wisely concedes that DiNunzio's testimony regarding Limoli's description of how members of the Patriarca Family learned that he had stolen Spagnolo's  cocaine was inadmissible under Rule 804(b)(3). The government also correctly asserts that DiNunzio's identificatio ns of Annette and Lena Chiuchiolo were admissible as personal knowledge. We find, however, that the district court's  error  in  admitting this hearsay evidence did not affect Barone's substantial rights, particularly given that Jordan's testimony and the evidence obtained through electronic surveillance established the same facts, which were not significant to the case against Barone, as the government points out.  DiNunzio testified that Limoli told her that Barone had  "skimmed" cocaine from him. The government maintains that this  statement inculpates Limoli in the possession of cocaine, but concedes that DiNunzio's testimony regarding Barone's actions  was  inadmissible under Rule 804(b)(3). The government argues, however, that because Barone elicited this testimony -35- 35 for  the  first time on cross-examination, he cannot be heard to complain  about its admission, citing United States v. Angiulo, 897 F.2d 1169, 1216 (1st Cir. 1990); United States v. Vachon, 869  F.2d  653,  658-59  (1st Cir. 1989), and that other statements elicited  for  the first time on cross-examination were harmless beyond a reasonable doubt (DiNunzio's testimony that Limoli said that Walter Jordan had robbed him of a gun and a set of pearls; harmless in view of Jordan's own admissions), or generally admissible as prior inconsistent statements (DiNunzio's testimony regarding prior statements she had made to the police, the FBI, and the grand jury). We agree. B. Barone also challenges the admission of Limoli's statements on the grounds that they do not satisfy Rule 804(b)(3)'s  "corroborating circumstances" requirement and that the statements lack the "particularized guarantees of trustworthiness" required by the Confrontation Clause.9  The  Rule  804(b)(3)  and  Confrontation Clause inquiries are  not  coterminous, and evidence that is admissible under the former  may  still be inadmissible under the latter. See, e.g., White v. Illinois, 502 U.S. 346, 352-53 (1992); Idaho v. Wright ,  497  U.S.  805,  814 (1990); California v. Green, 399 U.S. 9. The Confrontation Clause of the Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  -36- 36 149, 155 (1970). But the hearsay rules and the Confrontation Clause share the purpose of permitting the use of probative evidence that is trustworthy and excluding that which is not. See Houlihan, 92 F.3d at 1281. Accordingly, we will consider Barone's  "corroborating  circumstances" and Confrontation Clause challenges together, deeming that which satisfies the Confrontation Clause to be sufficient to satisfy Rule 804(b)(3)'s  corroboration requirement as well. Cf. Wright, 497 U.S. at 821 ("Because evidence possessing 'particularized guarantees  of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception, we think  that  evidence admitted under the former requirement must similarly  be  so trustworthy that adversarial testing would add little to its reliability.") (citations omitted).  1. Barone argues that the district court abused its discretion in admitting Limoli's out-of-court statements because the statements are insufficiently corroborated or are entirely lacking in corroboration.10 We disagree.  10. By its terms, Rule 804(b)(3) requires corroboration only for statements "tending to expose the declarant to criminal liability and offered to exculpate the accused." Fed. R. Evid. 804(b)(3) (emphasis added). See Fed. R. Evid. 804(b)(3) advisory committee's note (explaining that declarations against interest "tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provision insuring trustworthiness"). The rule does not explicitly require corroboration for the type of statements at issue here, those offered by the government to inculpate the -37- 37 First, Barone misconstrues Rule 804(b)(3)'s corroboration t s 11 The corroboration that is required by Rule  804(b)(3)  is  not  independent evidence supporting the truth of  the  matters  asserted  by the hearsay statements, but evidence that clearly indicates that the statements are worthy of belief, based upon the circumstances in which the statements were  made.   S ee United States v. Innamorati, 996 F.2d 456, 475 requirement to the extent that he argues tha there is a lack of evidence "corroborating" the event described by Limoli. (1st  Cir.  1993) ("'[F]or the declaration to be trustworthy the declarant must have known it was against his interest at the time he made the statement.'") (quoting Filesi v. United accused. See, e.g., United States v. Fields, 871 F.2d 188, 192 (1st Cir. 1989). Nevertheless, a number of courts have interpreted Rule 804(b)(3) to require corroboration whether the statement inculpates or exculpates the accused. See United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996); United States v. Thomas, 62 F.3d 1332, 1337 (11th Cir. 1995), cert. denied, --- U.S. ---, 116 S. Ct. 1058 (1996); United States v. Casamento, 887 F.2d 1141, 1170 (2d Cir. 1989); United States v. Boyce, 849 F.2d 833, 836 (3d Cir. 1988); United States v. Alvarez, 584 F.2d 694, 701 (5th Cir. 1978).  Although this court has not expressly extended the corroboration requirement to statements that inculpate the accused, see Fields, 871 F.2d at 192, we have applied the rule as if corroboration were required for such statements, see Seeley, 892 F.2d at 2. The Supreme Court has not decided the issue, explicitly declining to do so in Williamson, 512 U.S. at 605. 11. Barone asserts, inter alia, that DiNunzio's testimony regarding what Limoli told her about events relevant to the prosecution of this case comprises the only evidence against Barone regarding certain events, and that, while Karpowicz- DiPietro's testimony appears to corroborate some of DiNunzio's testimony, this testimony, like DiNunzio's, was also hearsay, improperly admitted at trial.  -38- 38 States, 352 F.2d 339, 343 (4th Cir. 1965) (alteration in Innamorati); United States v. Casamento, 887 F.2d 1141, 1170 (2d Cir. 1989) (in determining whether a declaration against penal  interest is sufficiently trustworthy as to be admissible under Rule 804(b)(3), "the district court must look to the circumstances in which the declarant made the statement"). Analysis  of  trustworthiness under the Confrontation Clause also focuses upon the circumstances surrounding the making of the statement. See Wright, 497 U.S. at 819 (in determining the trustworthiness of hearsay evidence under the Confrontation Clause, the court should consider "only those [circumstances] that surround the making of the statement and that render the declarant  particularly  worthy of belief"); Lee v. Illinois, 476 U.S. 530, 544 (1986) (determining trustworthiness from the circumstances surrounding the making of the statement). Second, Barone misapprehends the corroboration requirement  to the extent that he argues that corroboration is required because DiNunzio is not credible. The corroboration requirement  is not concerned with the veracity of the in-court witness but with the trustworthiness of the out-of-court statement; moreover, the credibility of witnesses is a matter for the jury. See Seeley, 892 F.2d at 3 (agreeing with the Second  Circuit in United States v. Katsougrakis, 715 F.2d 769, 777 (2d Cir. 1983), that neither Rule 804(b)(3) nor the Confrontation Clause "requires the trial court to make a -39- 39 special  assessment of the credibility of a witness who relates an  out-of-court  declaration against penal interest; rather, the credibility of an in-court witness is ordinarily a matter for the jury").  Third, the corroboration requirement "should be construed in such a manner as to effectuate its purpose of circumventing fabrication," Fed. R. Evid. 804(b)(3) advisory committee's note, and "[t]he fear that inculpatory statements are unreliable stems largely from the presumption that such statements are self-serving, offered only to shift the blame from the declarant to another." York, 933 F.2d at 1363. See Innamorati, 996 F.2d at 474-75. These concerns do not arise where, as here, the portions of the statements that are inculpatory as to the defendant are also directly against the declarant's penal interest; where the statements were made to close  relatives  of  the  declarant;12 and where we can discern no attempt on the part of the declarant to diminish his role in the  criminal  activity described in the statements. See Sasso, 59 F.3d at 349; Matthews, 20 F.3d at 546.  We  conclude  that the portions of the statements that are inculpatory as to Barone are in no way self-serving as to 12. While the fact that the challenged statements were made to allies has no bearing on the question whether the statement is against the declarant's penal interest, it is relevant to the determination of whether the circumstances indicate that the declarant was motivated to shift blame to the other individual inculpated by the statement. -40- 40 Limoli, and therefore we see no reason to question the trustworthiness of any of the challenged statements on blame- shifting grounds. See York, 933 F.2d at 1362-63 (explaining that the circumstances surrounding the declarant's statements inculpating the defendant -- speaking to acquaintances unconnected to law enforcement authorities -- make them "eminently  trustworthy,"  and noting that the advisory committee used that scenario as an example of an inculpatory statement that "would have no difficulty in qualifying" for admission under Rule 804(b)(3)).  In the final analysis, the Rule 804(b)(3) corroboration inquiry is concerned only with the admissibility of hearsay evidence based upon its trustworthiness, a determination  committed  to the sound discretion of the district court. See United States v. Vretta, 790 F.2d 651, 659 (7th Cir.  1986)  ("A trial judge has considerable discretion, within the  parameters  of  the  rules of evidence, in determining whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness."). See also Barrett, 539 F.2d at 253. Matters such as the truth of what is asserted by hearsay statements, the credibility of witnesses, and the weight to be accorded evidence are for the finder of fact.  Here, the district court, in ruling on Barone's motion in limine, determined that the challenged portions of DiNunzio's testimony were sufficiently corroborated and -41- 41 trustworthy as to be admissible under Rule 804(b)(3) and the Confrontation Clause. We agree with the district court that the detailed nature of Limoli's statements; the fact that Limoli made the statements to close relatives in a non- custodial  setting rather than to the police; and the fact that Limoli  had  no discernible motivation to lie to either DiNunzio or Karpowicz-DiPietro in making these statements constitute "corroborating circumstances [that] clearly indicate the trustworthiness  of  the  statement[s]." Accordingly, we conclude that  the  district  court  did not abuse its discretion in finding Limoli's statements to be sufficiently corroborated as to be reliable and admissible under Rule 804(b)(3).  -42- 42 2. Barone argues that the admission of Limoli's statements violated his confrontation rights.13 The Supreme Court has explained that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990). See Zannino, 895 F.2d at 5. When a hearsay declarant is not present for cross-examination, the Confrontation Clause requires a showing that (i) the declarant is  unavailable, 14  and  (ii) the statements sought to be admitted bear adequate "indicia of reliability." Ohio v. Roberts, 448 U.S. 56, 66 (1980).  Where the evidence is admitted under a "firmly rooted"  hearsay exception, reliability may be inferred without more.   See  id . at 66; Wright, 497 U.S. at 817 (explaining that "[a]dmission  under a firmly rooted hearsay exception satisfies 13. In Williamson, the Supreme Court did not reach the Confrontation Clause issue because it remanded the case, rather than declare any statements to be admissible under Rule 804(b)(3). 512 U.S. at 605. 14. Although unavailability is not in dispute here, we note that, while the unavailability of the declarant is required under Rule 804 as a matter of evidence law, a demonstration of unavailability (or production of the declarant at trial) is not always required by the Confrontation Clause. See White v. Illinois, 502 U.S. at 353-57; United States v. Inadi, 475 U.S. 387, 392-400 (1986); Manocchio v. Moran, 919 F.2d 770, 774-76 (1st Cir. 1990). -43- 43 the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience  in  assessing  the trustworthiness of certain types of out-of-court statements"); id. at 821 ("statements admitted under a 'firmly rooted' hearsay exception are so trustworthy that adversarial testing would add little to their reliability"). Statements that do not fall within a firmly rooted  exception  are  "presumptively unreliable and inadmissible for Confrontation Clause purposes," Lee v. Illinois, 476 U.S. at 543, and therefore "must be excluded, at least absent a showing of particularized guarantees of trustworthiness," Roberts, 448 U.S. at 66 (footnote omitted).  Barone maintains that the hearsay exception for declarations against interest is not firmly rooted and, therefore, such declarations are presumptively untrustworthy and inadmissible in the absence of proof by the government of the reliability of the statements. In making this argument, Barone simply ignores the fact that this court has held the declarations against interest exception to be firmly rooted. See  Saccoccia ,  58  F.3d  at 779; Innamorati, 996 F.2d at 474 n.4. We  recognize  that  some  courts have questioned whether the declarations against interest exception is firmly rooted, and whether it should be treated as such where the statement implicates another person in addition to the declarant. See United States v. Dean, 59 F.3d 1479, 1493 & n.24 (5th Cir. -44- 44 1995), c ert. denied, --- U.S. ---, 116 S. Ct. 794 (1996); Matthews, 20 F.3d at 545 (collecting cases); United States v. Flores ,  985  F.2d  770  (5th Cir. 1993).15 We find these cases to be inapposite to our analysis of the instant case because, in contrast to the statements at issue here, the hearsay statements in these cases were made under circumstances in which the declarant had a "strong motivation to implicate the defendant and to exonerate himself," thereby raising the concern that the statements were made in order to shift blame to  another  or to curry favor with law enforcement authorities. See, e.g., Lee v. Illinois, 476 U.S. at 541. We think that where, as here, it is clear that the statements inculpating both the declarant and the defendant were not made in order to limit the declarant's exposure to criminal  liability,  the  declarations against interest exception is properly treated as firmly rooted for Confrontation Clause purposes. See York, 933 F.2d at 1362-64. Nevertheless, because  we  agree  with  the district court that the statements at issue  in  this  case  bear  sufficient indicia of reliability as to be  admissible under the Confrontation Clause, we need not rely 15. Although the Williamson Court did not decide whether the declarations against interest exception is firmly rooted, the Court did point out that "the very fact that a statement is genuinely self-inculpatory -- which our reading of Rule 804(b)(3) requires -- is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." 512 U.S. at 605 (citing Lee v. Illinois, 476 U.S. at 543-45). -45- 45 upon the firmly rooted status of the exception in order to sustain the district court's ruling.  "The  critical  inquiry  for determining 'particularized guarantees of trustworthiness' is whether 'the test of cross- examination would be of marginal utility.'" United States v. Trenkler, 61 F.3d 45, 64 (1st Cir. 1995) (quoting Wright, 497 U.S. at 820) (footnote omitted). We are satisfied that the circumstances surrounding the making of Limoli's statements to DiNunzio  and  Karpowicz-DiPietro demonstrate that the statements are "so trustworthy that adversarial testing would add little to their reliability." See Wright, 497 U.S. at 821. In arguing that the testimony of DiNunzio and Karpowicz-DiPietro lacked the corroboration and indicia of reliability required by Rule 804(b)(3) and the Confrontation Clause,  Barone relies heavily upon United States v. Mokol, 939 F.2d 436, 439 (7th Cir. 1991). Citing Mokol, Barone urges us to consider the following factors: "the character of the witness for truthfulness and honesty and the availability of evidence  on  the issues and the witness' relationship with both the defendant and government and his motivation to testify." Appellant's Br. at 28-29. He invites us to conclude from our consideration of these factors that DiNunzio16 was not a 16. Barone does not explicitly attack the credibility of Karpowicz-DiPietro, but does argue that her testimony was admitted in violation of his confrontation rights. -46- 46 credible witness and, therefore, that her testimony as to Limoli's statements lacks adequate indicia of reliability.  Barone's reliance upon Mokol is grossly misplaced for a number of reasons. First, Mokol did not address the admissibility of hearsay statements made by an unavailable declarant to an ally under Rule 804(b)(3), but the distinct question of the admissibility of prior testimony under the residual  hearsay exception of Rule 804(b)(5). In this regard, it is important to recognize that the Supreme Court has held that the residual hearsay exception is not firmly rooted for purposes of Confrontation Clause analysis. See Wright, 497 U.S.  at  817-18 (explaining that "[h]earsay statements admitted under the residual exception, almost by definition, . . . do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception," and that "were we to agree that the admission of hearsay statements under the residual exception automatically passed  Confrontation Clause scrutiny, virtually every codified hearsay exception would assume constitutional stature, a step this Court has repeatedly declined to take"). See also Government  of  Virgin  Islands v. Joseph, 964 F.2d 1380, 1387 (3d Cir. 1992) (equating the state-law residual hearsay exception at issue in Wright with Rule 804(b)(5), and applying to Rule 804(b)(5)  Wri ght's holding that the residual hearsay exception is not firmly rooted and therefore requires a showing of -47- 47 particularized guarantees of trustworthiness); Trenkler, 61 F.3d  at  64  n.32  (explaining that the residual hearsay exception contained in Federal Rule of Evidence 803(24) is not a firmly rooted exception, citing Wright and Joseph). But see United States v. Panzardi-Lespier, 918 F.2d 313, 319 (1st Cir. 1990) (rejecting a Confrontation Clause challenge to testimony admitted  under  the  residual hearsay exception of Rule 804(b)(5) on  the  ground that Rule 804(b)(5) is a firmly rooted exception to the hearsay rule).  Second, Barone errs in equating the hearsay declarant, the reliability of whose testimony in prior proceedings  was  at  issue  in Mokol, with DiNunzio and Karpowicz- DiPietro, whose live in-court testimony contains the hearsay statements.   Moreover, and as we have stated, the focus of the trustworthine ss inquiry is not on the in-court witness, but on the circumstances in which the declarant's out-of-court statements were made. See Wright, 497 U.S. at 819-20; Innamorati ,  996  F.2d  at  475; Casamento, 887 F.2d at 1170. Also as  noted  previously, the credibility of the in-court witnesses DiNunzio and Karpowicz-DiPietro is not an element of the admissibility inquiry (as a matter of Rule 804(b)(3) or Confrontation Clause analysis) but is a question for the jury. See Seeley, 892 F.2d at 3.  III. -48- 48 On October 20, 1993, after a nine-week trial, the jury began its deliberations. On October 25, 1993, the court gave a "modified Allen charge" in response to a note from the jury stating that it had reached an impasse and seeking the court's guidance. See Allen v. United States, 164 U.S. 492 (1896) (approving a supplemental jury instruction designed to encourage a deadlocked jury to reach a verdict). Prior  to  administering  the charge, the judge informed counsel  of  the  language  he intended to use and deleted language in  response  to  Barone's  objection. After the charge was given, Barone objected to the court's use of certain language which the  judge  had not mentioned in the pre-charge conference. The judge responded by preserving the objection, stating that he would  give  it  further  thought should he have occasion to repeat the charge. At 3:15 p.m., the jury informed the judge that there had been no change in their deliberations and asked the court's permission to return the following morning. In the afternoon of the next day, October 26, 1993, the jury communicated to the court that they had made no progress and saw "no potential for coming to a unanimous decision on any of the four counts through continued rational discussion." Barone moved for a mistrial, which the court denied. The court then informed the jury that it would not accept the jury's conclusion as "the final word in this matter," but would dismiss the jury for the remainder of the -49- 49 day and begin the next day by repeating the modified Allen charge. Barone did not object to the proposed second Allen charge, but did object to the judge's statement to the effect that, in his experience, the jury had not deliberated for an unusually  long period of time. He again moved for a mistrial, and the court denied the motion.  The following day, October 27, 1993, the judge repeated the modified Allen charge, omitting the language to which  Barone  had objected after the judge had administered the first Allen charge. On October 28, 1993, the district judge dismissed a juror pursuant to Federal Rule of Criminal Procedure 23(b), see infra, and on October 29, 1993, the eleven-member  jury  returned verdicts of guilty as to Counts One through Three, but failed to reach a verdict as to Count Four (charging Barone with Limoli's murder). Barone contends that, in giving the jury a second Allen charge, the district court violated his Fifth Amendment right  to  due  process of law and his Sixth Amendment right to a fundamentally fair trial, arguing that the practical effect of the district court's dismissal of a juror after having given two  modified  Allen charges was to force the eleven-member jury to render coerced and suspect verdicts.  Barone  argues that a trial court should never give a second  modified Allen charge. Several circuits, including the Second Circuit in particular, have rejected the use of a flat -50- 50 ban,  and  judge  the  propriety of a second charge in light of the United States Ruggiero, 928 F.2d 1289, 1299 circumstances. See v.  (2d Cir. 1991).17 The Ninth Circuit, over a strong dissent, has adopted a per se rule against multiple Allen charges, although this rule is subject to at least one major exception,  permitting a successive charge if the jury requests a  repetition  of  the  instruction. United States v. Seawell, 550 F.2d 1159, 1163 (9th Cir. 1977).  The danger with an Allen charge is that jurors who hold a minority opinion will feel that the judge is putting pressure  on  them  to  surrender their viewpoint. Even though the modified Allen charge expressly warns that this is not its purpose, many have been concerned that it pushes in this direction. See United States v. Angiulo, 485 F.2d 37, 38-39 (1st  Cir.  1973).   Although the courts have held that the charge is accepted as a reasonable compromise of conflicting interests,  the problem is exacerbated when the charge is given a second time, after the jury has already been told to reconsider and again has found itself in deadlock. A successive  charge  tends  to create a greater degree of pressure, and one could argue that at this point the limit has been reached. 17. See also United States v. Seeright, 978 F.2d 842, 850 (4th Cir. 1992); United States v. Reed, 686 F.2d 651, 653 (8th Cir. 1982); United States v. Fossler, 597 F.2d 478, 485 (5th Cir. 1979). -51- 51 In the present case, the second charge came very after the first, when the district court apparently concluded that the jury had not seriously reconsidered. ollowing  the  first  modif charge, the jury deliberated quickly F ied Allen only for the remainder of the day on which it received the charge and part way into the next day before reporting back that it remained deadlocked. Given the length and complexity of the case -- a nine-week trial with very difficult RICO instructions  --  the  district court was surely within its rights in thinking that the jury had not absorbed the message of the first Allen charge, that the jury should make a reasonable effort to break the deadlock.18 Although we sustain the district court in this case without  much  difficulty and decline to adopt a per se rule, we do think that caution needs to be used before the modified Allen charge is given for a second time. At a minimum, there ought normally to be special circumstances, and not merely a continued  inability by the jury to decide, to justify a second charge.   But  circumstances vary enormously; the trial judge is closer to the facts, and with this one note of warning, we adhere to the majority view that each case must be judged on its own facts. 18. See Reed, 686 F.2d at 652-53 (jury deliberated for only about one hour between first and second charge); United States v. Robinson, 560 F.2d 507, 517-18 (2d Cir. 1977) (en banc) (jury deliberated for only three hours between first and second charge). -52- 52 IV. Federal Rule of Criminal Procedure 23(b) commits to the  discretion of the district court both the determination of whether in the circumstances "just cause" exists to excuse a juror after the jury has retired to deliberate, and the decision to proceed with a jury of eleven in the event that a juror  is  excused  for  just cause. Fed. R. Crim. P. 23(b). See, e.g. , Casamento , 887 F.2d at 1187.  Barone contends that the district court abused its discretion under Rule 23(b) and violated his Fifth Amendment right to due process of law by excusing a juror during deliberations over his objection. He asserts that the court's removal  of  the  juror  "irreparably altered not only the dynamics of the jury, but its impartiality as well." Barone argues further  that, in permitting the eleven-member jury to continue to  deliberate  after  the  juror's dismissal, rather than granting his  motion  to  declare  a  mistrial, the district court abused its discretion under Rule 23(b) and violated his Sixth Amendment right to a unanimous verdict.  A. On  October  27,  1993,  the  jury foreperson informed the court that, during the jury's lunch break that day, a Federal Protective Service Officer ("FPO") told one of the jurors, Douglas Berger, that Berger's cousin had been represented in another matter by one of Barone's attorneys. The court -53- 53 promptly met with counsel and discussed at length the problem and what ought to be done about it. At several points during this discussion, Barone moved for a mistrial, but the court decided  to  question the jury foreperson, Berger, and the other jurors before ruling on the motion.19  The district judge first spoke with the jury foreperson. Then, after discussion with counsel, the court called for Berger, instructing him as follows:  I  want  you  to listen to the questions I'm going to ask you, carefully. Try to answer those questions fully, but don't tell  me  more  than I ask you about, because there's some things I need to know and some things that at the moment, I don't intend to get into. Basically, I want to know what happened downstairs in the lunchroom and how you feel about it. I don't want to know what has been going on upstairs in the jury room. So, those are sort of the general areas that I'm interested in and with regard to what has gone on upstairs, at the moment, I don't want you to tell me.  After listening to Berger's recollection of his conversation with the FPO, the judge asked Berger "And what effect, if any, does this have on your ability, or may this have  on  your  ability  to  deliberate and decide the case based on the evidence and the law and on nothing else, including this information and event?" Berger replied, 19. The district court's investigation into the matter is chronicled in greater detail in United States v. Barone, 846 F. Supp. 1016 (D. Mass. 1994).  -54- 54 Well, this is going to -- I have no problem with it. It's just that things I'd have problems with if the jury, say, is hung and someone thinks that I had something to do with it. I don't want someone to be pointing a finger at me and saying, well, you know, he defended your cousin and you were going with him, and you know, I don't know what the deal -- what happened with my cousin. If someone could  say,  well, it would be out of spite. I just -- It's something I don't want to deal with. I think it would be very difficult for everyone upstairs, also. After asking Berger to step out, the judge again conferred  with counsel before recalling Berger to question him further regarding a discrepancy between his version and the FPO's version of events. After Berger stepped out again, the judge expressed doubts about his credibility, candor, and ability to continue to serve as a juror, but deferred his decision as to how to resolve the matter until the next day. On the morning of October 28, 1993, the judge began by stating his view that Berger's ability to deliberate had been  impaired and that he should be excused from the jury. He also stated that, in order to decide under Rule 23(b) whether to declare a mistrial or proceed with eleven jurors, he would question each of the remaining jurors individually. Barone's counsel  stated  that  if  the court did not grant a mistrial, then Berger should not be excused.  After further consultation with counsel, the judge called  for  Berger.   The  judge reminded Berger that he was under oath and again instructed him that, in answering the court's -55- 55 questions, he should take care not to reveal anything, "directly or indirectly, about how you're voting up there, or how  the  jury  is divided, or what your view of the evidence is, or  anybody  else's." The judge then questioned Berger again in an effort to determine whether he was able to deliberate and vote solely on the basis of the evidence and the law as instructed  by  the  court.  In response to the court's questions, Berger  stated that he would "have a hard time" and that he did not "feel right." When asked whether he wished to be excused from  the  case, Berger replied, "I wouldn't object. I wouldn't say I don't want to be, but I really don't feel I should be here  anymore  .  .  .  I  don't think it's right that I stay." When the court asked him for his "most candid responses" as to whether he could avoid being influenced in deliberating and voting by concerns about how it might look later, Berger replied, "I don't know if I can really [d]o that and that concerns  me.   It  concerns me a lot. Maybe it shouldn't, but it does."  The judge concluded that Berger's receipt of extra- judicial information had impaired his ability to continue to deliberate  as  an  impartial juror and, therefore, that there was just cause to excuse Berger from the jury under Rule 23(b). Over Barone's objection, the court excused Berger, with instructions not to discuss the matter with anyone.  -56- 56 The court then announced its intention to determine whether the remaining eleven jurors could continue to deliberate fairly and impartially. The judge stated that he would not declare a mistrial without further inquiry because the trial had been a long one and would require considerable government,  defense, and judicial resources to retry, but that he would let counsel be heard on how to proceed if, after his individual voir dire of the eleven remaining jurors, he determined that the jurors were impartial. He explained that "[t]his is the type of situation Rule 23(b) was intended to address,  according  to  the Advisory Committee notes, by allowing juries  of  eleven, in the court's discretion, and my overriding concern is with the fairness of the trial."  After further consultation with counsel, and following counsel for Barone's requests regarding what questions to ask, the court conducted an individual voir dire of each juror. The court concluded that no juror had been affected by the information that Berger received or by his dismissal;  that each juror was fair and impartial; and that no evidence  of  pressure  or  anxiety was discernible in the demeanor of any of the remaining jurors. Accordingly, the district court  denied  Barone's motion for a mistrial, opting instead to continue deliberations with eleven jurors pursuant to Rule 23(b).   The  jury  returned its verdicts the following afternoon. -57- 57 "When  a  non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial."   United  States v. Ortiz-Arrigoitia, 996 F.2d 436, 442  (1st  Cir.  1993)  (citations omitted). See Angiulo, 897 F.2d at 1184-86. The district court is not, however, bound by a rigid set of rules and procedures "that compel any particular form or scope of inquiry," but is "vested with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct actually occurred and whether it was  prejudicial." Ortiz-Arrigoitia, 996 F.2d at 443 (citation omitted). "Substantial deference is due the trial court's exercise of its discretion in handling situations involving potential  juror  bias  or  misconduct," Angiulo, 897 F.2d at 1185, and  the  deference  due  the court's ultimate finding on the issue of continued juror impartiality is enhanced because this determination is a question of fact, id. at 1186.  Here, the trial judge promptly addressed the matter in  open  court, and the inquiry was as thorough as the response was prompt. The judge conferred with counsel at great length over  a  period of two days, affording counsel ample opportunity to  express  their  concerns, and entertaining their arguments and suggestions regarding questions to ask of jurors and how to proceed. The judge interviewed all the jurors -- taking care -58- 58 in his questions not to intrude upon their deliberations and consulting  with  counsel  throughout -- and carefully weighed the testimony, demeanor, and credibility of Berger and the other jurors. A more careful and thorough approach than the one taken by the district judge here is difficult to imagine. In the end, the district court reasonably concluded that Berger could  not  continue  to  deliberate as a fair and impartial juror, but that his incapacity had not impaired the ability of the remaining jurors to carry out their service fairly and impartially.  The  trial  judge  has  substantial discretion under Rule 23(b) to remove a juror after deliberations have commenced where the judge has determined that the juror's ability to perform her duties has been impaired. See United States v. Walsh, 75 F.3d 1, 5 (1st Cir. 1996). Barone protests that "Berger's  concerns were not about his ability to be impartial, but the perceptions of others"; that Berger indicated his ability to deliberate and vote based solely on the evidence; and that the district court "discounted juror Berger's assurances of his own capability to decide the case based on the evidence." Barone's argument seems to be that Berger's initial representation that his receipt of extra-judicial information  from the FPO had not affected his ability to serve as an impartial juror was sufficient to establish his -59- 59 competence to deliberate impartially and, therefore, the district court acted improperly in dismissing him.  But a juror's representations regarding her ability to perform fairly and impartially are not dispositive, see Murphy  v.  Flo rida, 421 U.S. 794, 800 (1975); rather, the trial court  must  make  its  own  determination of the juror's ability to be  fair  and  impartial, see United States v. Egbuniwe, 969 F.2d 757, 761-62 (9th Cir. 1992). In all events, the question is not whether the district court could have kept Berger on the jury based upon his initial representation, but whether the court acted within its discretion in excusing him from the jury. See Casamento, 887 F.2d at 1187 ("Whether or not the judge  properly could have kept this juror on the jury based on her representation is not the issue here. Even if he could have done so, it does not follow that he was obligated to do so.").  We  conclude  that  the  district court did not abuse its discretion under Rule 23(b) in excusing Berger after jury deliberations  had  begun;  nor did the court violate Barone's due process rights by removing Berger. In this context, due process demands no more than what Barone received here, "'a jury capable and willing to decide the case solely on the evidence  before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.'" Olano, 507 U.S. at 738 -60- 60 (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  B. Barone  also  argues  that  the district court abused its discretion under Rule 23(b), and violated Barone's Fifth Amendment right to due process of law and his Sixth Amendment right to a unanimous verdict by allowing deliberations to continue (rather than declaring a mistrial), and in accepting verdicts  returned  by  a  jury of less than twelve members. In so doing,  Barone  contends,  the district court committed reversible error  by  depriving him of "one of the safeguards of liberty, a hung jury." Rule 23(b) was amended in 1983 in order to address the very problem presented here, that of how to deal with the necessity  of  excusing  a  juror after deliberations have begun.20 As amended, Rule 23(b) gives judges the discretion to permit eleven-member juries to deliberate to a verdict if one juror becomes unavailable.21 See Fed. R. Crim. P. 23(b) advisory 20. We note that under the federal rules the substitution of an alternate juror is not within the district court's discretion once the jury has begun to deliberate. See Fed. R. Crim. P. 24(c) ("An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."); Olano, 507 U.S. at 737-41 (treating the presence of alternate jurors during deliberations as a violation of Rule 24(c)); Houlihan, 92 F.3d at 1285-88 (same). 21. The Supreme Court has made clear that the Constitution does not require twelve jurors for conviction. See Williams v. Florida, 399 U.S. 78 (1970). We have stated that Williams -61- 61 committee's  note;  United  States v. Smith, 789 F.2d 196, 204 (3d Cir.  1986).   The amendment was intended to provide a preferred mechanism for avoiding a mistrial where a juror is excused after  deliberations have begun, United States v. Stratton, 779 F.2d  820,  831 (2d Cir. 1985), particularly "when the trial has been a lengthy one and consequently the remedy of mistrial would necessitate a second expenditure of substantial prosecution, defense and court resources," Fed. R. Crim. P. 23(b) advisory committee's note.  The district court determined that, at the time of Berger's dismissal, the trial had been in progress for nearly eleven weeks and would require "considerable government, defense,  and  judicial  resources to retry," and that each of the remaining jurors could continue to deliberate fairly and impartially, based solely upon the evidence and the court's instructions.  In United States v. Brown, 823 F.2d 591, 597 (D.C. Cir. 1987), the court held that "Rule 23(b) is not available when  the  record  evidence  discloses a possibility that the juror believes that the government has failed to present sufficient evidence to support a conviction." See also United States v. "effectively answers the claim that 11 jurors are too few," Walsh, 75 F.3d at 6, and all courts to have considered the matter have held Rule 23(b) to be constitutional, see United States v. Ahmad, 974 F.2d 1163, 1164 (9th Cir. 1992); United States v. Armijo, 834 F.2d 132, 134 (8th Cir. 1987); United States v. Smith, 789 F.2d 196, 204-05 (3d Cir. 1986); United States v. Stratton, 779 F.2d 820, 831-35 (2d Cir. 1985). -62- 62 Hernandez, 862 F.2d 17, 23 (2d Cir. 1988). In this case the record reveals that, during his colloquies with Berger, the district  judge  repeatedly instructed him not to disclose how he was voting or how the deliberations had been going. Still, some of Berger's responses to the court's questions arguably suggest  the  possibility  that Berger may not have been persuaded that  the  government had proven Barone guilty. For example, on October 27, 1993, Berger stated: It's just that things I'd have problems with  if  the  jury, say, is hung and someone thinks  that  I had something to do with it. I don't want someone to be pointing a finger at me and saying, well, you know, he  defended  your cousin and you were going with him . . . . And on October 28, 1993, Berger said: I don't feel right. . . . I don't want anybody, whether it be someone in the general public finding out, or anybody up in  the  jury.  I don't want to be looked at as, well, you know, he had a reason. I don't want anyone to think how I vote, I have a reason to do it other than the evidence presented in court. But, in contrast to Brown, in which the record evidence "indicate[d] a substantial possibility that juror Spriggs  requested  to  be  discharged because he believed that the evidence offered at trial was inadequate to support a conviction,"  823 F.2d at 596, here the record contains no true evidence regarding Berger's views on the merits of the case. Moreover,  the  district  judge in this case "did not construe any remark by Mr. Berger as a statement of how he was voting and -63- 63 certainly did not consider which party he might have been supporting in deciding whether to excuse him." United States v. Barone, 846 F. Supp. at 1020. Thus, in contrast to the juror in Brown (who indicated to the judge that he was unable to discharge his duties  because  he  disagreed with the RICO laws and was troubled by the presentation of evidence), Berger was excused for a valid  reason  that  was  entirely unrelated to the issue of how he felt  about  the sufficiency of the government's proof; i.e., he was excused because the district court determined that his receipt  of  extra-judicial information from the FPO had impaired his ability to carry out his role fairly and impartially.  We  think  that,  where,  as  here, a juror is removed for a just cause that is unrelated to the juror's views of the sufficiency of the evidence, and there is no indication that the  removed  juror was a holdout juror, Brown's admonition that "a court may not dismiss a juror during deliberations if the request  for  discharge  stems from doubts the juror harbors about the  sufficiency  of  the  government's evidence," 823 F.2d at 596, does not apply. We conclude that the district court did not abuse its discretion in permitting the eleven-member jury to deliberate  to  a  verdict,  rather than declaring a mistrial. See United States v. Gambino, 598 F. Supp. 646, 660-61 (D.N.J. 1984)  (stating  that  it  would have been "unthinkable" to declare a mistrial rather than proceed with eleven jurors, given the -64- 64 investment of judicial resources in a six-week trial and over twenty hours of jury deliberation), aff'd, 788 F.2d 938 (3d Cir. 1986). See also United States v. Armijo, 834 F.2d 132, 135 (8th Cir. 1987) (holding that the district court did not abuse its discretion in permitting an eleven-member jury to render a verdict in a five-day trial).  Finally, we reject Barone's argument that the verdicts  in  this  case  were not unanimous, and therefore violate the  Constitution, as merely a rephrasing of his constitutional challenge to the verdict rendered by an eleven-member jury. Although  the  Supreme Court has not ruled on the constitutional permissibility  of  a  less-than-unanimous verdict, see Apodaca v. Oregon ,  406  U.S. 404 (1972), we have stated that "rendition of a  verdict  agreed  to  by  all jurors, after one juror with unknown views has been dismissed for cause, is a unanimous verdict," Walsh, 75 F.3d at 6. -65- 65 V. For the foregoing reasons, the judgment of the district court is affirmed. -66- 66