UNITED STATES of America, Appellee,

v.

Ralph T. WILSON, Appellant.

Nos. 97–3076, 97–3077 and 97–3129.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1998.

Decided Nov. 20, 1998.

Reita Pendry, Assistant Federal Public Defender, argued the cause for appellant Ralph T. Wilson. With her on the briefs was A. J. Kramer, Federal Public Defender.

Thomas G. Corcoran, Jr., Washington, DC, appointed by the court, argued the cause and filed the briefs for appellant Louis Wilson.

Richard Seligman, Washington, DC, appointed by the court, argued the cause and filed the briefs for appellant Marcellus Judd.

All counsel for appellants were on the joint briefs.

Barbara J. Valliere, Assistant U.S. Attorney, Washington, DC, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher, Thomas J. Tourish, Jr., and Arthur G. Wyatt, Assistant U.S. Attorneys. Mary–Patrice Brown, Assistant U.S. Attorney, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge, GINSBURG and ROGERS, Circuit Judges.

ROGERS, Circuit Judge:

These appeals arise out of the murder of a government witness scheduled to testify in the trial of James Wilson, who was charged with robbing a United States Post Office. The postal robbery charge was based on information supplied by the witness, who had worn a wire while he and James were at the Lorton Reformatory. Following James's arraignment on January 17, 1996, the government turned over to James's attorney a copy of the Lorton tape and transcript on the condition that the attorney not give copies of this material to anyone, including James, without the government's prior permission. The tape, as well as a January 25 letter from the prosecutor to James's attorney, revealed that the government's key witness was named Leroy Copeland. Shortly before the March 26 trial date, James's attorney met with James's wife and brother Ralph to review the evidence against James, informing them of Copeland's role and playing and reading portions of the tape and transcript to them. That evening the Wilson brothers— Ralph and Louis—began looking for Copeland. On March 25, Kirk Thomas, whom the Wilson brothers had enlisted to find Copeland, spotted Copeland and informed Marcellus Judd that Copeland was in the area. That evening, Louis murdered Copeland by shooting him repeatedly. The jury found James's brothers Ralph and Louis, as well as Marcellus Judd, guilty of conspiracy to kill a witness (18 U.S.C. § 371), killing a witness with intent to prevent him from testifying (*id.* § 1512(a)(1)(A)), retaliating against a witness (*id.* § 1513(a)(1)(B) & (2)), and first degree murder while armed (D.C.Code §§ 22–2401, –3202). Louis was also convicted of two counts of using a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)) and possession of a firearm during a crime of violence (D.C.Code § 22–3204(b)).

On appeal, appellants contend that the district court erred in impaneling an anonymous jury, denying severances, admitting the Lorton tape recording, excluding evidence that other persons might have murdered Copeland, instructing the jury on credibility and conspiracy, and providing copies of the trial transcript in response to a note from the jury. Judd further contends that there was insufficient evidence to convict him of conspiracy and of aiding and abetting. Louis contends that one of his consecutive § 924(c) convictions must be vacated and that the District of Columbia and federal charges merge, as do the § 1512 and § 1513 (killing and retaliation) charges. Concluding that appellants' contentions are mostly unpersuasive, we affirm their convictions except for Judd's convictions, which we reverse, and one of Louis Wilson's § 924(c) convictions, which we vacate.

I.

In contending that the district court erred in denying his motion for judgment of acquittal, Judd maintains that the evidence showed only that "Judd made statements during casual conversation . . . while discussing the shooting." Our review is *de novo*, considering the evidence in the light most favorable to the government and determining whether any rational trier of fact

could find all of the essential elements of the crime beyond a reasonable doubt. *See United States v. Harrington,* 108 F.3d 1460, 1464 (D.C.Cir.1997). As this court has observed, however,

> [t]his review, although deferential, is not servile: "We do not ... fulfill our duty through rote incantation of these principles followed by summary affirmance. We must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law. A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation."

*United States v. Harrison,* 103 F.3d 986, 991 (D.C.Cir.1997) (quoting *United States v. Long,* 905 F.2d 1572, 1576 (D.C.Cir.1990) (Thomas, J.)). We therefore cannot sustain a jury's verdict when "the government's web of inference is too weak to meet the legal standard of sufficiency." *United States v. Teffera,* 985 F.2d 1082, 1086 (D.C.Cir.1993).

■ The validity of Judd's convictions turns on whether the government presented sufficient evidence to show that Judd was part of the conspiracy and aided and abetted the murder of Leroy Copeland. The government offered evidence that on two occasions on the day of the shooting Judd informed the Wilson brothers that Copeland was in the area: first, when the Wilson brothers showed up in the area within ten minutes after Judd was seen in the same area as Copeland,[1] and second, when Kirk Thomas informed Judd that Copeland was in the area and Copeland was subsequently killed.[2] The government also presented evidence that Judd returned to the area where Copeland was shot. Finally, the government presented evidence that after the murder Judd told two people (Glenn Young and Steve Hamilton) that he had been the person who had informed the Wilson brothers that Copeland was in the area.

■ To prove that Judd was a conspirator, the government has the burden to show that he "entered into an agreement ... to commit a specific offense," that he "knowingly participated in the conspiracy with the intent to commit the offense," and that "at least one overt act was committed in furtherance of the conspiracy." *United States v. Gatling,* 96 F.3d 1511, 1518 (D.C.Cir.1996); *see also United States v. Wynn,* 61 F.3d 921, 928–29 (D.C.Cir.1995). The existence of an agreement is the *sine qua non* of the statutory crime of conspiracy. *See United States v. Treadwell,* 760 F.2d 327, 336 (D.C.Cir.1985). Thus, the government had to offer evidence that Judd agreed to join the Wilson brothers' effort to murder Copeland. Viewing the evidence most favorably to the government, as we must, *see Gatling,* 96 F.3d at 1517, the evidence shows only that Judd knew that the Wilson brothers were looking for Copeland, that he learned from Thomas that Copeland had been seen in the area, that he twice informed the Wilson brothers of that fact, and that he was in the same area as Copeland when Copeland was killed.

■ To convict, the jury would need to infer not only that Judd knew that the Wilson brothers planned to murder Copeland, but also that with knowledge of their plan and objectives, he agreed to join them. Given that several witnesses were in a position to offer testimony about the nature of Judd's involvement with the Wilson brothers' effort, the absence of such evidence is telling. While there was evidence that the Wilson brothers enlisted Thomas in an effort to locate and identify Copeland, informing Thomas of the reasons for their search, and that Thomas told Judd that another man (Young) had seen Copeland in the area, neither the

---

1. Copeland did not arrive in the District of Columbia until March 24. Around noon on March 25, Steve Hamilton saw Copeland at 5th and O Streets, N.W., looking for heroin. While Hamilton was purchasing heroin, he noticed Judd on the street. Hamilton then entered an abandoned house to use the heroin. About ten minutes later he emerged and saw the Wilson brothers, in their car with guns, looking for Copeland. Copeland had already left the scene.

2. Earlier in the evening, Thomas, who was with Glenn Young, encountered Copeland at the Bundy School playground. Thomas later saw Judd by his car and informed him that Copeland had been spotted in the area. According to Thomas, this last exchange occurred shortly before the shooting, although he could not say how long. Copeland's friend Kevin Eddings saw the shooter, whom he later identified as Louis Wilson, as did Tim Carrington.

Wilson brothers nor Thomas nor anyone else testified that Judd was told to inform the Wilson brothers, much less that the Wilson brothers and Judd were part of a joint effort to kill Copeland. That Judd twice informed the Wilson brothers of Copeland's presence shows, at best, only general knowledge of a planned crime, which is insufficient to prove conspiracy. *See Teffera*, 985 F.2d at 1087.

 The sufficiency of the evidence of aiding and abetting presents, perhaps, a closer question. Aiding and abetting requires the government to prove: "(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge (3) that the other was committing an offense; and (4) assisting or participating in the commission of the offense." *United States v. Gaviria*, 116 F.3d 1498, 1535 (D.C.Cir.1997). The elements of aiding and abetting may overlap to some extent with, but still differ from, those of conspiracy. *See United States v. Beckham*, 968 F.2d 47, 51 (D.C.Cir.1992). In any event, the government still fails to meet its burden. To prove aiding and abetting the government must show that Judd shared some intent with the Wilson brothers and took some affirmative action to assist them in carrying out their plan to kill Copeland. *See Gaviria*, 116 F.3d at 1535. Although the intent of the aider and abettor need not be identical to that of the principal, *see United States v. Walker*, 99 F.3d 439, 442 (D.C.Cir. 1996), the government still was required to show that Judd had sufficient knowledge and participation to allow a reasonable juror to infer that he "knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed." *Teffera*, 985 F.2d at 1086 (quoting *United States v. Raper*, 676 F.2d 841, 849 (D.C.Cir.1982)).

In other words, the government must show that Judd intended to bring about Copeland's murder (or to retaliate against Copeland or to prevent him from testifying) and that he knew why and what the Wilson brothers intended to do to Copeland. Here, there was no evidence that Judd knew of the Wilson brothers' criminal enterprise when he alerted them that Copeland was in the area. *See Teffera*, 985 F.2d at 1086. Again, while several of the government's witnesses were in a position to identify Judd as having such knowledge, none did. Nor was there evidence that Judd had an interest in seeing the Wilson brothers succeed. *See id.* at 1087. The evidence shows only that Judd told the Wilson brothers that Copeland was in the area. Such conduct is susceptible, as in *Teffera*, 985 F.2d at 1086, of too many plausible innocent explanations: Judd could simply be a gossip, mischievous, or hoping to land in the Wilson brothers' good graces. Judd's knowledge that the Wilson brothers were looking for Copeland is simply not evidence that Judd knew that the Wilson brothers were intending to kill Copeland and that Judd had decided to assist them in that enterprise. Contrary to the government's position, the evidence did not show that after informing the Wilson brothers on March 25 that Copeland was in the area Judd sought out Copeland in order to be in a position to identify him for the Wilson brothers when they arrived on the scene. Instead, Copeland approached Judd, who was standing near his car across the street, presumably seeking a ride. Moreover, only the government's brief, but no witness, characterized Judd's post-murder statements as boasting, and there was evidence to suggest that Judd, like others, did not know the shooting was going to occur.

 While the government is not required to negate all possible innocent explanations of a defendant's behavior, *see id.* at 1088, the alternative explanations available for Judd's conduct provide an equally plausible if not more plausible account than the government's theory, and the government cannot prevail on the basis of jury speculation, *see Long*, 905 F.2d at 1576, *cited in Teffera*, 985 F.2d at 1088. Had anyone else in the neighborhood told the Wilson brothers that Copeland was in the area, the government's theory of Judd's guilt would apply to them as well. Indeed, a government witness (Steve Hamilton) indicated that he also knew what Judd knew, namely that people were looking for Copeland. Thus, the evidence put Hamilton, as well as several others, including Thomas, Young, and Carrington, in the same position as Judd with regard to knowledge. Hence, the government's theory

of Judd's guilt casts too broad a net and quite simply the "web of inference is too weak." *Teffera*, 985 F.2d at 1086. As is true with the evidence of conspiracy, there was no evidence that Judd aided and abetted the Wilson brothers in murdering Copeland.

For these reasons we hold that there was insufficient evidence to convict Judd of conspiracy and aiding and abetting.

## II.

Appellants' contentions that the district court erred in denying their motions for severance are unpersuasive.[3]

▮▮▮ Marcellus Judd, a codefendant, made two post-murder statements that were admitted into evidence. Glenn Young testified that Judd told him that he, Judd, went to the Wilson brothers' home on the evening of Copeland's death and told Louis that Copeland was in the area. Judd repeated his statement to Steve Hamilton, who advised him to keep this information to himself. The Wilson brothers maintain that Judd's post-murder statements were hearsay and that admission of the statements violated their rights under the Confrontation Clause; thus severance of their trials from Judd's was required. This court has generally favored joint trials, *see United States v. Manner*, 887 F.2d 317, 324 (D.C.Cir.1989), and reviews the denial of a severance for an abuse of discretion, *see United States v. Brown*, 16 F.3d 423, 432 (D.C.Cir.1994). While Confrontation Clause challenges are reviewed *de novo*, the district court's findings of trustworthiness are reviewed for clear error. *See United States v. Workman*, 860 F.2d 140, 144 (4th Cir.1988). We hold that the district court did not err in determining that the statements were against Judd's penal interest and sufficiently reliable to be admitted in a joint trial.

▮▮▮ A statement is against interest if "at the time of its making [it is] ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3). Moreover, as the Supreme Court made clear in *Williamson v. United States*, 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), "[e]ven statements that are on their face neutral may actually be against the declarant's interest." Judd's statements that he had informed the Wilson brothers that Copeland was in the area are, set alone, hardly incriminating. But their timing is key, occurring the day after the murder to one man who had witnessed the murder and to another man who knew Copeland. As such the statements were potentially incriminating had there been evidence that Judd was part of the conspiracy or an aider and abettor to the Wilson brothers. *See id.* at 603, 114 S.Ct. 2431.[4] Indeed, one of the persons to whom he made the statement advised Judd to keep the information to himself, suggesting that it was against Judd's interest. Given the evidence that Young and Hamilton were acquaintances if not friends of Judd, the circumstances indicate that his statements were reliable. *See United States v. Matthews*, 20 F.3d 538, 546 (2d Cir.1994); *see also* Fed. R.Evid. 804(b)(3) notes of advisory committee on proposed rules.

▮▮▮ Nor is the Confrontation Clause a barrier to the admission of Judd's statements. Appellants' reliance on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), as interpreted by this court in *United States v. Coachman*, 727 F.2d 1293 (D.C.Cir.1984), is to no avail. In *Coachman*, the court held that the admission of an accomplice's statements against inter-

---

3. For ease of reference we continue to refer to "appellants," even though our disposition of Judd's sufficiency contentions means that we need not, and we do not, address his other contentions. Our reference from this point on to "appellants" is confined to Ralph and Louis, to whom we also refer as "the Wilson brothers."

4. Our holding that the government failed to adduce sufficient evidence to convict Judd of conspiracy and aiding and abetting does not alter our conclusion that Judd's post-murder statements were against his penal interest. At the time that the statements were admitted into evidence, they were probative of Judd's possible guilt, and the mere fact that the statements alone do not create an inference of guilt beyond a reasonable doubt does not remove them from the ambit of Rule 804(b)(3).

est that also incriminated the defendant violated the defendant's Confrontation Clause rights where the declarant was unavailable for cross examination. *See* 727 F.2d at 1296–97. After this circuit decided *Coachman*, the Supreme Court clarified the Sixth Amendment inquiry when the government seeks to admit a nontestifying codefendant's statement that inculpates[5] another defendant in a joint trial. *See Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). Under *Cruz*, a court may, in a joint trial, admit an out of court confession or statement against penal interest by one defendant that inculpates a codefendant if the statement is "directly admissible" against the other defendant. *Cruz*, 481 U.S. at 193, 107 S.Ct. 1714. Generally, such a statement will be directly admissible if it is reliable, as defined in *Lee* and in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and if the declarant is

unavailable to testify, *see Cruz*, 481 U.S. at 193, 107 S.Ct. 1714 (citing *Lee*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514).[6] In *Roberts*, the Court noted that a statement is admissible and does not violate the Confrontation Clause where there is a necessity (*i.e.*, the witness is unavailable) and the statement bears sufficient "indicia of reliability" in that it falls within a "firmly rooted hearsay exception," or has "particularized guarantees of trustworthiness" such that "there is no material departure from the reason for the general rule." *Roberts*, 448 U.S. at 62–67, 100 S.Ct. 2531. After *Lee*, the question remains whether statements against penal interest can qualify as a firmly rooted hearsay exception as a class or whether each statement must qualify through its particularized guaranties of trustworthiness.[7] We do not address this question because we conclude that the particular statements admitted in the instant case were reliable.

---

5. The Supreme Court has acknowledged that not all inculpatory statements are equally inculpatory, and has held that with a proper limiting instruction, admission in a joint trial of a codefendant's out of court statement that does not "facially incriminat[e]" another defendant is permissible. *See Gray v. Maryland*, —— U.S. ——, ——————, 118 S.Ct. 1151, 1154–57, 140 L.Ed.2d 294 (1998); *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *see also United States v. Applewhite*, 72 F.3d 140, 145–46 (D.C.Cir.1995). The government does not claim that *Richardson* or its progeny applies in the instant case. Appellants however, interpret *Gray*, involving redacted confessions, to hold that the statement of a nontestifying defendant that inculpates codefendants is inadmissible in a joint trial. However, the Court in *Gray* revisited *Bruton* and *Richardson* to clarify that statements that incriminate only inferentially are outside the scope of *Bruton*. The Court explained that such statements if included under *Bruton* analysis "too often would provoke mistrials, or would unnecessarily lead prosecutors to abandon the confession or joint trial, because neither the prosecutor nor the judge could easily predict, ... whether or not *Bruton* had barred use of the confession." *Gray*, 118 S.Ct. at 1157. Although Judd's statement named the Wilsons, his statement was not a confession that "facially incriminated" them. Judd's statement, which was against his penal interest, inculpated Judd as well as the Wilson brothers only when it was linked with other evidence at trial. It was not the sort of statement under *Bruton* or *Gray* that would require severance or exclusion.

6. In other words, if the government seeks to admit an out of court statement by defendant A against A, and such testimony also inculpates codefendant B, the testimony is inadmissible in the joint trial unless it would be admissible against B if B were tried alone. Thus, the government may not use a joint trial to bootstrap admission of incriminating hearsay against one codefendant that it would not be able to admit if the trials were severed.

7. In *Lee* the Court noted that confessions have a rebuttable "presumption of unreliability" and do not fall within a "firmly rooted" hearsay exception. 476 U.S. at 543, 106 S.Ct. 2056. In footnote 5, the Court also seemed to reject a broad application of the statement against penal interest exception to allow the admissibility of confessions, observing that "the concept defines too large a class for meaningful Confrontation Clause analysis." *Id.* at 544 n. 5, 106 S.Ct. 2056. In the end, the Court did not state whether the penal interest exception was "firmly rooted" and the circuits have taken different views on the issue. *See United States v. Moses*, 148 F.3d 277 (3d Cir.1998); *United States v. Keltner*, 147 F.3d 662 (8th Cir.1998); *LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir.1998); *Neuman v. Rivers*, 125 F.3d 315 (6th Cir.1997); *Earnest v. Dorsey*, 87 F.3d 1123 (10th Cir.1996); *United States v. Trenkler*, 61 F.3d 45 (1st Cir.1995); *United States v. Matthews*, 20 F.3d 538 (2d Cir.1994); *United States v. Flores*, 985 F.2d 770 (5th Cir.1993); *United States v. York*, 933 F.2d 1343 (7th Cir.1991).

■ As the government suggests, because Federal Rule of Evidence 804(b)(3) is based on the idea that "declarations against interest are reliable because people do not make such statements unless believing them to be true," *United States v. Barone*, 114 F.3d 1284, 1295 (1st Cir.1997), statements that inculpate both the declarant and the codefendant are admissible if they "truly" fit the exception to the hearsay rule. Viewing the totality of circumstances, the district court could reasonably find that Judd's statements to Young and Hamilton were reliable. Judd's statements were not contained in a confession to law enforcement officials. He made the statements to lay persons with whom he had no motive or incentive to diminish his role by shifting blame, *see id.* at 1292; quite the contrary, Judd's statements revealed conduct beyond his mere presence in the area where Copeland was seen and shot. Judd's statements also occurred at different times to different people on the day after the murder.[8]

### III.

■ Appellants also contend that the district court erred in denying their motion for a new trial because the government violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by tardily disclosing two statements by Kevin Eddings the day before he and Thomas testified at trial. Under *Brady*, the government must "disclose to an accused exculpatory information that is both favorable and material to guilt or punishment. This duty extends to evidence drawing into doubt the credibility of a witness when the witness' reliability may be determinative of guilt or innocence." *United States v. Dean*, 55 F.3d 640, 663 (D.C.Cir.1995). While the government maintains the statements fall only within the ambit of *Jencks* statements,[9] in viewing them as *Brady* material, we note that in the district court appellants did not request a continuance in order to determine whether the statements supported a viable alternative defense, nor request a mistrial, nor even claim a *Brady* violation had occurred; instead, they made effective use of the statements at trial. We find no plain error. *See United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

In the first statement, made to law enforcement officials in April 1996, Eddings indicated that Copeland was afraid of one of the men they encountered at the Bundy playground. (That man was Thomas.) He stated that he and Copeland encountered the same man near a church, and Copeland spoke to the man, who responded to the effect that "I'm [James's] brother, your problems are with him not me."[10] The second statement was Eddings's grand jury testimony, where he repeated that Copeland had told him to run if the man (later identified as Thomas) made a move, and that he and Copeland ran, eventually coming to 5th and N Streets,

8. Even if admission of the statements was error, the error was harmless beyond a reasonable doubt, *see Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in light of the nonconflicting, nonambiguous, and overwhelming evidence against Ralph and Louis. The Lorton tape, *see infra* Part V, established their motive to kill and to retaliate; James's attorney testified that Ralph had heard portions of the tape; Thomas testified that on that same night Ralph enlisted his help in finding Copeland; Hamilton saw Ralph and Louis armed at 5th and O Streets, N.W., looking for Copeland around noon on the day of the murder; and in a telephone conversation after the murder Ralph told James's son that his father's trial "looked alright now." In addition, four eyewitnesses saw Louis shoot Copeland.

9. *See Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); 18 U.S.C. § 3500 (1994).

10. In the early evening, Eddings had met his friend Copeland and they walked to the Bundy School playground. Two men, later identified as Young and Thomas, were in the Bundy playground sitting on a wall. In earlier statements to the police and the grand jury, Eddings said that Copeland told him that if one of the men made a move they should run. When Thomas stood up, Copeland and Eddings ran from the playground.

Copeland and Eddings, upon leaving the park, proceeded to 5th and N Streets, N.W. At the corner they encountered Thomas, Carrington, and Young. Copeland then began "loud-talking" to Young, or to no one in particular, about the fact that he was not "Hot," and if they killed him they would be killing the wrong person. At this point, Copeland saw Marcellus Judd and called out to him. Then Eddings heard a shot. Eddings, Young, and Carrington identified the shooter as Louis Wilson.

N.W., where Copeland was shot. Eddings put Thomas, Young, and another man named Tim Carrington together on the street corner when the shooting occurred. Eddings recanted his earlier claim, however, that an exchange had occurred near the church between one of the Wilson brothers and Copeland. Thus, Eddings told the police and later the grand jury that he had seen the shooter earlier that day at the Bundy playground and chose Louis's photograph as resembling the person he had seen.

Beyond disclosing the largely immaterial recantation by Eddings before the grand jury, the government maintains, persuasively, that there is virtually nothing in Eddings's statements to support a viable alternative defense theory that Thomas was the shooter. Not only was Eddings consistent in identifying the person he thought was the shooter, he was standing across the street from the place where the shooting took place, and he and other government witnesses placed Thomas with Eddings. At most, then, Eddings's statements revealed that his identification of Louis as the shooter was undermined by his claim that the shooter had been in the Bundy playground earlier. They also revealed that Copeland feared Thomas, and raised the question of where the Wilson brothers were immediately before the shooting and how Judd could have gone to retrieve someone (Louis) who was already at the scene.

■ But even if Eddings's statements were potentially of greater importance to the defense than the government suggests, a new trial is rarely warranted based on a *Brady* claim where the defendants obtained the information in time to make use of it. *See United States v. Dean*, 55 F.3d 640, 663 (D.C.Cir.1995); *United States v. Paxson*, 861 F.2d 730, 737 (D.C.Cir.1988); *United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C.Cir. 1988). Appellants have the burden to show that "had the statements been disclosed earlier, there is a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted." *Tarantino*, 846 F.2d at 1417. Appellants make no such showing.

First, appellants made effective use of the statements at trial. Ralph ended his cross examination of Eddings by eliciting an admission that the shooter was the same person from the Bundy playground, contradicting Eddings's earlier testimony. As the government notes in its brief, "[t]here was nothing left to say." Second, appellants fail to show, beyond vague generalities, how the trial would have been different with earlier knowledge of Eddings's statements. Having decided to use Eddings's statements in cross examination rather than request time from the district court to determine whether there was a viable alternative defense with Thomas as the shooter, appellants' *Brady* claim loses force. Appellants therefore fail to show a "reasonable probability" of a different result.

## IV.

■ Nevertheless, for other reasons, appellants contend that they were denied the opportunity to develop a defense theory that a third party committed the murder. We review the district court's decision to deny admission of evidence for abuse of discretion, finding abuse where "it plainly appears that the excluded evidence bears on a matter that could be determinative of guilt or innocence." *United States v. Morgan*, 581 F.2d 933, 936 (D.C.Cir.1978). We find no error, much less an abuse of discretion.

■ A defendant has a constitutional right to present a defense, *see Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and the district court must proceed cautiously in restricting such efforts, *see United States v. Stewart*, 104 F.3d 1377, 1384 (D.C.Cir.1997); *United States v. Foster*, 982 F.2d 551, 552 (D.C.Cir. 1993). At the same time, the district court may properly restrict the presentation of evidence based on concerns that the evidence might confuse or mislead the jury. *Cf.* Fed. R.Evid. 403. Appellants challenge the district court's exclusion of evidence with regard to: (1) FBI Agent Bamel, who was not permitted to give the names of other defendants against whom Copeland was scheduled to testify; (2) Christine Huff, who was not allowed to identify one of three young men she

claimed did the shooting; and (3) Terrence Blair, who was not allowed to testify that he heard another person state shortly after the shooting, "That's going to teach niggers don't mess with our business."

▮▮▮▮▮▮ Appellants' contentions regarding the first two witnesses are meritless. During Agent Bamel's testimony the district court allowed the jury to hear that Copeland had assisted the government in numerous cases, but drew the line at admitting the names of the defendants in those other cases. Specific names would be irrelevant for the jury to hear absent some proffer—and there was none—that one of those named individuals had an opportunity to kill Copeland. As for Christine Huff, she was called as a witness by Louis, and the district court ruled that if Ralph's attorney wanted to venture into the subject of other people Huff saw shooting Copeland he should call Huff as his own witness, because that subject exceeded the scope of Louis's direct examination of Huff. Ralph never attempted to call Huff as his own witness; and consequently, he has no basis to claim that the district court restricted him from presenting evidence of third-party culpability. Moreover, Huff did testify she saw a man other than Louis shoot Copeland; she was prevented only from identifying that man, whom she knew by a nickname.[11]

▮▮▮ Appellants' contention about the third witness—that the district court improperly restricted Terrence Blair's testimony—turns on the nature of the statements Blair purportedly heard. Blair testified that he and his girlfriend were coming from the park when they heard shots and saw people scattering. They approached the area where Copeland's body lay, and as Blair and others stood around talking, a man approached from behind. Defense counsel proffered that Blair would testify that the man, who looked as if he had a gun, said in effect that Copeland got what he deserved and that his death would

teach others not to mess in our business. Defense counsel argued that the statement was admissible as a statement against penal interest or, alternatively, that it was a statement that Blair reported to the police that should have been a part of the investigation of the murder. The government countered that the statement did not qualify as one against penal interest and that as a statement used to exculpate the defendant, the statement required corroboration. The district court agreed that the statement was not against penal interest because its meaning and relevance could not be determined and thus it was inadmissible hearsay. In addition, the evidence could not be admitted to show that the FBI had a lead it did not follow because the information was irrelevant and such testimony might place Blair in unnecessary jeopardy.

Regardless of whether, as the government urges, evidence that a third party committed the crime is admissible only if coupled with "substantial evidence,"[12] or, as appellants argue, is admissible without a heightened showing,[13] the district court was well within its discretion to exclude it. The court simply refused to allow testimony about an ambiguous remark by an unidentified man about whom nothing more was known. Such proffered evidence hardly meets *Winfield's* "reasonable possibility" test and is tantamount to evidence about a hypothetical suspect. *See Gethers v. United States*, 684 A.2d 1266, 1271 (D.C.1996). We accordingly find no error.

## V.

Appellants also contend that the district court erred in admitting into evidence the Lorton tape recording because the government failed to lay a foundation by showing that Ralph had heard the entire tape; the tape contained references to inadmissible prior bad acts; the probative value of the tape was substantially lessened by an offer to

---

11. In rebuttal, the government called FBI Agent Bamel, who testified that Huff often changed her story.

12. *See, e.g., Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir.1993). *But see United States v. Crosby*, 75 F.3d 1343, 1346 (9th Cir.1996).

13. *See Winfield v. United States*, 676 A.2d 1, 4 (D.C.1996) (in banc); *see also United States v. Thomas*, 896 F.2d 589, 591 (D.C.Cir.1990).

stipulate that the Wilson brothers knew Copeland would be a witness at James's trial; and the tape should have been excluded under Federal Rule of Evidence 403. Although the tape contains brutally frank descriptions of appellants' involvement in other criminal matters, we find no abuse of discretion by the district court. *See United States v. Crowder,* 141 F.3d 1202, 1210 (D.C.Cir.1998) (in banc); *United States v. Johnson,* 970 F.2d 907, 912 (D.C.Cir.1992); *United States v. Moore,* 732 F.2d 983, 992 (D.C.Cir.1984).

■ Appellants' foundation argument is seriously flawed. They maintain that the tape is admissible only insofar as one of the conspirators heard it, and that in order to admit the entire tape to show Ralph Wilson's motive, the government was required to show that he heard the entire tape. Appellants point to the "conditional fact" requirement to support their theory. *See* Fed. R.Evid. 104(b); *Huddleston v. United States,* 485 U.S. 681, 689–90, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Matta–Ballesteros,* 71 F.3d 754, 767–68 (9th Cir. 1995), *amended on denial of reh'g and reh'g in banc,* 98 F.3d 1100 (9th Cir.1996). Having failed to show that any defendant heard the full tape—the conditional fact—appellants maintain that the full tape was irrelevant.

Yet appellants ignore two salient facts. First, at the pretrial conference, the government represented that it could demonstrate that James, as an unindicted co-conspirator, read or reviewed the entire transcript of the Lorton tape recording. James's attorney testified that he "went over" the transcript with his client and that he would have been "remiss" not to share information with his client. In spite of this testimony, appellants maintain that it would be pure speculation to infer that James, the attorney's client, knew the contents of the tape in at least as much detail as his wife and brother. On the contrary, it seems highly unlikely that an attorney would share information with his client's wife and brother that has not first been discussed with the client; thus, it is highly unlikely that Ralph and James's wife learned before James of Copeland's existence as a witness. In conjunction with evidence of telephone records between James at Lorton and the Wilson family, the jury could reasonably infer that James learned the contents of the tape and relayed the information to his brothers.

Second, James's attorney provided the necessary foundation. He testified that on March 20, 1996, six days before James's trial date, he had played portions of the tape for Ralph and James's wife. He specifically recalled playing portions of the tape that covered the postal robbery and where James identified himself, his son, and the family. The attorney also revealed Copeland's name.

■ As to appellants' contention under Rule 403, the tape was relevant evidence of appellants' motive because the incriminating statements on the tape were elicited by the murder victim. *See* Fed.R.Evid. 404(b) & 401; *cf. United States v. DeAngelo,* 13 F.3d 1228, 1231–32 (8th Cir.1994). The tape, combined with the evidence that the same evening Ralph had enlisted the assistance of Thomas in locating Copeland because he would be a government witness at James's trial, provided the jury with a reasonable basis to infer that something the attorney told Ralph caused him to act the same day. In addition, evidence of a nineteen-minute telephone call from James to Ralph's home on March 22 supports an inference that the brothers discussed the Lorton tape. So viewed, the evidence supported the district court's determination that the tape was discussed by James and Ralph a few days before the murder.

Appellants, however, take the position, in view of the testimony by James's attorney that he played only portions of the Lorton tape during his meeting with Ralph and James's wife, that only the identified portions actually played were admissible. Thus, only the portions of the tape reflected on page 11 of the tape transcript as well as later portions regarding James's identity, his son, the family, and the "Wilson gang" are admissible. There are two problems with appellants' position. First, some of the more inflammatory portions of the tape were those that the attorney admitted playing for Ralph and James's wife. The district court was therefore on firm ground—under appellants' theory—to admit these portions of the tape.

Second, although James's attorney was unable to identify specifically what other parts of the tape he played or what portions of the transcript he read, he acknowledged relaying the information to Ralph and James's wife "to let them know what the status of the case was, and that Mr. Copeland would be called as a witness regarding those conversations allegedly recorded." With this testimony, the government met its burden of showing, for purposes of admission of the tape to show appellants' motive, that members of the conspiracy heard the tape recording or learned the contents of the tape transcript. Consequently, the success of appellants' attack on the admission of the entire Lorton tape rests on their contention that the jury heard gratuitously prejudicial portions of the tape that should have been excluded under a proper Rule 403 balancing.

Tape recordings that are segregable into discrete portions without engendering confusion or detracting from the government's legitimate need to prove its case may include some portions that are dramatically more prejudicial and less probative than others. In such circumstances, the proper procedure, as with a live witness testifying about the substance of a partially admissible conversation, would be to admit only those portions of the recording that satisfy Rule 403. The government is entitled to use a tape recording to tell a story, but not to inflate the narrative into a soap opera. The Lorton tape recording revealed through the words of brother James a vivid picture of the Wilson family. At page 11 of the tape transcript, James described himself as a "beast" and discussed the details of the postal robbery. In other parts of the tape, he described himself as a "beast," his son as a "beast", and the Wilson family as a "family-run organized gang." He also claimed that "we was robbing banks." In appellants' not unreasonable view, the tape "implicated them in other crimes and depicted them in a brutal fashion."

Appellants somehow find support in *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), for their contention that the Lorton tape should not have been admitted because they were willing to stipulate that the defendants had a motive to kill Copeland. Fairly read, however, *Old Chief* would permit the government to demonstrate appellants' intent through the admission of the Lorton tape recording, which "tells a colorful story with descriptive richness," *id.* at 653, rather than be confined to a mere stipulation, *see id.* at 654–55. The government points out that the tape showed not only that Copeland had betrayed appellants' brother, but also that he had information about them. Striking the tape, or at least some portions, would thus have weakened the government's depiction of the depth of Copeland's betrayal and eliminated this aspect of appellants' motive. The only issue in the instant case is therefore whether the district court abused its discretion in permitting the jury to hear the entire story—as opposed to edited fragments—recounted on the Lorton tape.

It is true that the Lorton tape was not the government's only means of proving motive. Even if the government could not be forced to accept the defense offer to stipulate, the government's discovery letter to James's attorney that was in evidence disclosed that Copeland would testify against James and thus sufficed to show a motive and was properly part of any Rule 403 analysis. *See Crowder,* 141 F.3d at 1210. Still, in *Crowder* this Court made clear that "the Rule 403 inquiry in each case involving Rule 404(b) evidence will be case-specific. There can be no 'mechanical solution,' no per se rule...." *Id.* Consequently, the fact that this court reversed a conviction on the grounds that the prosecutor, during cross examination of the defendant and another witness, "by innuendo ... painted a picture of [the defendant and the witness] as seedy and sinister characters," *United States v. Shelton,* 628 F.2d 54, 56 (D.C.Cir.1980), is not dispositive in this case.

The district court noted upon reviewing the tape that there were "some areas of just gratuitous vulgarity," but reasoned that "just removing gratuitous vulgarity for the sake of removing it could create a problem." The court explained that not only did the tape have "descriptive richness" that was absent from the prosecutor's letter, "[o]nly as the

pieces of the conversation come together can the jury infer, if it deems it appropriate, its cumulative effect on Ralph Wilson and Louis Wilson." Nevertheless, the district court did exclude a portion of the tape.[14] The court also instructed the jury that it was to consider the tape for the limited purpose of deciding whether the defendants had a motive to kill Copeland. Although the tape did convey an unsavory impression of the Wilson brothers and in closing argument the prosecutor relied on the tape,[15] it does not follow, given the teaching of *Old Chief,* that the district court abused its discretion. Even under appellants' theory, the government was entitled to present its evidence to tell the story since Ralph heard key portions of the tape. Additional portions did not substantially magnify the unfavorable light already cast by those portions James's attorney confirmed he played. Under the circumstances, the district court could properly conclude, in light of the nature of the evidence that would be before the jury, that the Lorton tape recording would not be unduly prejudicial.

We acknowledge however, that appellants' Rule 403 challenge to the tape presents a close question. The transcript indicates that about half of the tape is at best only marginally probative of motive. These portions of the tape illustrate the relationship between Copeland and James, and thus indicate why appellants would be upset at the betrayal of this relationship; but they consist solely of vulgar bantering and meaningless patter. Although only marginally probative, these portions are prejudicial. Excising these portions seemingly would not have deprived the government of the "descriptive richness" or context needed to convey its theory of motive because the remaining portions impart an accurate flavor of the Copeland–Wilson relationship.[16] Nevertheless, we do not conclude that the district court erred because not only did appellants fail to request such a parsing of the tape but the transcript demonstrates that the clearly probative portions of the tape are no less prejudicial than the more marginally probative portions. The district court therefore did not abuse its discretion in finding that editing the tape would have done more harm, by fragmenting the narrative, than good.

## VI.

Appellants challenge the impaneling of an anonymous jury, two jury instructions, and the provision of transcripts to the jury. We treat these claims summarily because they lack merit.

 First, in impaneling an anonymous jury, the district court carefully addressed the considerations set forth in *United States v. Edmond,* 52 F.3d 1080 (D.C.Cir.1995). The indictment itself suggested the need for an anonymous jury, particularly in light of the eve-of-trial murder of the government's key witness in the postal robbery case against James. *See id.* at 1091–92; *United States v. Riggio,* 70 F.3d 336, 340 n. 22 (5th Cir.1995). Moreover, the government had evidence that still another government witness in the instant case had been threatened that he would "end up like [Copeland]." Appellants were facing life sentences, *see United States v. DeLuca,* 137 F.3d 24, 32 (1st Cir.1998), and there was initial media interest in the trial, *see United States v. Paccione,* 949 F.2d 1183, 1193 (2d Cir.1991); *United States v. Vario,* 943 F.2d 236, 240 (2d Cir. 1991). Given the further evidence that

---

14. The district court excluded a reference to a homicide.

15. In closing argument, the prosecutor suggested to the jury that as Ralph listened to the tape, he formed a motive to join the conspiracy to kill Copeland. In rebuttal closing argument, the prosecutor argued that the tape implicated Ralph and Louis in other crimes and provided a motive for them to protect themselves and James from Copeland. The prosecutor also noted the references on the tape to the Wilson brothers as "beasts" and as a "gang" and to the claim that "[they were] robbing banks."

16. For example, the probative value of the following exchange eludes us:

W: I is not no bitch.
C: You acting like a bitch.
W: Yous a bitch.
C: You acting like a bitch.
W: Kiss me in the mouth.

To the extent that exchanges like this convey the type of background flavor necessary to comprehend appellants' motive, such flavor is evident in other, more clearly admissible, portions of the tape.

James viewed his family as a "family-run organized gang," the district court could reasonably conclude that an anonymous jury was appropriate.

 Nor did the district court abuse its discretion by not conducting an evidentiary hearing on the *Edmond* factors. Having heard arguments of counsel, the district court could reasonably determine that an evidentiary hearing was unnecessary inasmuch as the government was relying principally on the charges in the indictment and the prosecutor's affidavit. Appellants cite no contrary authority. Finally, the district court took reasonable precautions, instructing the jury that an anonymous jury was not out of the ordinary. As required by *Edmond*, appellants' fundamental rights were protected and they show no prejudicial effects. *See Edmond*, 52 F.3d at 1090.

 Second, Ralph Wilson has shown no plain error in the jury instructions (to which he did not object).[17] The substance of his challenge to the credibility instruction is that by instructing the jury to "determine where the truth lies" the district court deprived him of a verdict of guilt beyond a reasonable doubt.[18] It is true that this court has expressed the view that such an instruction is inconsistent with otherwise adequate burden of proof and reasonable doubt instructions. *See United States v. Rawlings*, 73 F.3d 1145, 1148 (D.C.Cir.1996). Yet not only did the district court here repeatedly and correctly instruct the jury that the government had the burden of proof beyond a reasonable doubt, appellant cites no authority that would require reversal of Ralph's convictions on this ground. In *United States v. Spencer*, 25 F.3d 1105, 1110 (D.C.Cir.1994), the court found no plain error where the jury was instructed to decide which theory of the case was correct, meaning the jury needed to decide who was lying, where there was a genuine conflict in the testimony of the two sides.[19] In contrast, the reversal in *Rawlings*, 73 F.3d at 1145, turned on a combination of errors, one involving an element of an offense, and another involving the "truth" instruction in a case where misidentification, not credibility, was the issue. *See id.* at 1148. No such combination of errors exists in the instant case. Moreover, in *Rawlings*, the court declined to hold that the "truth" instruction alone impermissibly shifted the burden of proof to the defendant. *See id.* at 1148 n. 4.

The challenge to the instruction on conspiracy rests on the mischaracterization that the instruction permitted the jury to convict on the basis of an overt act that preceded the existence of the conspiracy. In fact the evidence showed that the conspiracy to locate witnesses existed before March 20. Recall that in January and February 1996, James's attorney learned about Copeland's role as a witness and received a copy of the tape. From that time forward, James's attorney knew Copeland would be a witness and the likely contents of his testimony. In the attorney's view, he would have been "remiss" not to share this information with his client James. A reasonable juror could thus infer that prior to the attorney's March 20 meeting

17. Although he maintains the failure to object to the instruction on credibility is excused by the earlier understanding that the district court would give the modified 1993 version of instruction 2.11, that view would seriously undermine the contemporaneous objection rule. *See* Fed. R.Crim.P. 30; *see also Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 1548, 137 L.Ed.2d 718 (1997).

18. The jury instruction contained language deleted in the more recent, 1993 edition of the "Red Book." The statement "[i]f there is any conflict in the testimony, it is your function to resolve the conflict and to determine where the truth lies" was deleted from the 1993 edition of the standard instruction. The Red Book commentary explains that the clause was deleted because it suggested that the jury was required to determine "historical fact." *See* Model Jury Instructions for the District of Columbia, Instr. 2.11 Comment. The editors concluded that courts should not leave juries with the impression that they need to "resolve conflict" because, in fact, any unresolved conflict could simply weigh into the jury's ultimate determination that the prosecution failed to meet its burden of proof in a given case. *See id.* However, the commentary also notes that "there has been no case law addressing whether such an instruction is appropriate." *Id.*

19. In *Spencer*, the district court instructed the jury: "As somebody or both lawyers said, somebody is lying. It is perfectly obvious." *Id.* at 1110.

with Ralph and James's wife, the Wilson brothers knew that a damaging witness existed and sought more information at the meeting; thus, hearing the tape was an act "in furtherance" of the conspiracy to prevent this dangerous witness from testifying. The instruction, moreover, did not permit the jury to convict merely on the basis of the receipt of this information, but required the jury to find that the overt act of obtaining information was committed "to carry out the conspiracy."

■ Third, during its deliberations the jury sent a note to the district court requesting the transcripts of four government witnesses: Eddings, Hamilton, Young, and Carrington. Initially, the district court instructed the jurors "to let their recollection control." The next day, the prosecutor provided redacted transcripts of the witnesses' testimony (deleting the bench conferences) and the court, after learning from the jury that it still wanted them, decided to give the jury two copies of the transcripts. Defense counsel argued that the jury should also be provided with the testimony of two FBI agents who impeached the four government witnesses. The district court granted the jury's request and denied appellants', noting that the jury had not requested the additional transcripts and could be trusted to remember the testimony of the impeaching witnesses. Appellants now contend that this was an abuse of discretion because the jury received the bulk of the government's case in written form. *See United States v. Davis*, 974 F.2d 182 (D.C.Cir.1992).

■ The district court "enjoys broad discretion in responding to jury questions generally, and especially in deciding whether to provide requested testimony either in written form, or as read by a court reporter." *United States v. Boyd*, 54 F.3d 868, 872 (D.C.Cir.1995) (citations omitted). While this discretion is not unlimited as there are "two inherent dangers" in sending transcripts to the jury—the jury "may accord 'undue emphasis' to the testimony … [and it] may apprehend the testimony 'out of context,' "—the provision of transcripts is not inherently an abuse of discretion. *United States v. Rodgers*, 109 F.3d 1138, 1142 (6th Cir.1997) (citations omitted); *see also United States v. Escotto*, 121 F.3d 81, 84–85 (2d Cir.1997); *United States v. Lujan*, 936 F.2d 406, 411–12 (9th Cir.1991). In the instant case, the district court repeated its instruction that the jurors' recollections should control, determined the following day that the jury still wanted the transcripts, and additionally admonished that the jury remember that the transcripts represented only part of the evidence. In fact, the jury received the evidence in context because the transcripts sent to the jury included damaging cross-examination.

## VII.

■ Finally, Louis challenges his sentence, contending first that he could not be convicted of two counts of using a firearm in relation to a crime of violence, *see* 18 U.S.C. § 924(c), second, that the District of Columbia code conviction merges with his federal convictions, and third, that the § 1512 and § 1513 convictions also merge. In the government's view, the meritless basis for each challenge is that Louis had only one impulse to commit a crime. But Louis's first contention is not so readily disposed of.[20]

■ Section 924(c) provides that "[w]hoever, during and in relation to any crime of violence … for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to

---

**20.** By contrast, Louis's merger contentions require only summary treatment. *See United States v. Sumler*, 136 F.3d 188, 189–90 (D.C.Cir. 1998) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). D.C.Code §§ 22–2401, –3202 punishes first degree premeditated murder while armed. United States Code § 1512(a)(1)(A) punishes a killing (or attempted killing) of another person with intent to prevent the attendance or testimony of that person in an official proceeding. Unit-

ed States Code § 1513(a)(1)(B) punishes a killing (or attempted killing) of any person with intent to retaliate against that person for providing a law enforcement officer with information relating to the commission of any offense. The D.C.Code section requires premeditation, an element not present in either of the federal offenses. The federal offenses require an intent to prevent and an intent to retaliate respectively—elements not found in each other or in the crime under the D.C.Code.

the punishment provided for such crime of violence ... be sentenced to imprisonment for five years...." The fact that the statute appears to provide prosecutors with a means to tack on multiple counts for a single event or series of events, or for several firearms was addressed in *United States v. Anderson,* 59 F.3d 1323 (D.C.Cir.1995) (in banc). In that case, Anderson was charged with one count of conspiracy to distribute and possess with intent to distribute cocaine. He was also charged with four counts of violating § 924(c), one count based on a 9mm pistol seized in February 1989, a second count based on two weapons seized in March 1989, and the third and fourth counts based on two weapons seized from different locations on May 16, 1989, the date of Anderson's arrest. Following his conviction and sentences on all counts, Anderson contended that the multiple § 924(c) convictions could not be linked to only one underlying predicate offense and this court, sitting *in banc,* agreed, reasoning that "at a very minimum, § 924(c)(1) is ambiguous," and therefore the rule of lenity applies. *Id.* at 1333. As a result, only one § 924(c) violation may be charged in relation to one predicate crime.

While the holding in *Anderson* does not compel that one of Louis's § 924(c) convictions be vacated, because there are two predicate offenses that purportedly give rise to two § 924(c) violations, the reasoning underlying the *in banc* court's decision is no less applicable where a single use of a gun results in more than one offense. In *Anderson,* the court was confronted with a situation in which the defendant had been convicted of multiple § 924(c) charges, stemming from multiple uses and multiple guns, based on what the court concluded was an ambiguous statute. By contrast to *Anderson,* in the

instant case there is only one firearm and one use, but two underlying offenses. Nonetheless, our reasoning in *Anderson* and its application of the rule of lenity lead us to vacate one of Louis Wilson's § 924(c) convictions.

It is undisputed that Louis used his firearm only one time. Because there is no merger of the multiple offenses, *see supra* n. 20, the government maintains that each offense can provide the predicate for a § 924(c) charge. Yet this position ignores that the reason the offenses do not merge is because of the different mens rea requirements, not because of distinct conduct. While there may be circumstances in which such offenses could support more than one § 924(c) charge—as where, for example, the evidence shows distinct uses of the firearm, first to intimidate and then to kill—in the instant case there is no such distinction in time or place. However many crimes Louis may have committed by shooting Copeland, there was only one use (albeit a repeated use) of a firearm. The cases from other circuits on which the government relies are readily distinguishable, involving distinct conduct giving rise to multiple crimes.[21] In *Anderson* the court reasoned that Congress intended to "penalize the choice of using or carrying a gun in committing a crime." *Id.* at 1328 (emphasis omitted). That reasoning limits the number of § 924(c) counts that may be charged in the indictment arising out of Copeland's murder. Because there was only one use of the firearm, the *Anderson* rationale ineluctably leads to the conclusion that one of Louis's § 924(c) convictions must be vacated. Therefore, consistent with the understanding of congressional intent elucidat-

---

**21.** In each case on which the government relies, separate conduct and uses of firearms by the defendant gave rise to the underlying offenses charged. In *United States v. Andrews,* 75 F.3d 552, 557–58 (9th Cir.1996), on which the government relies for the proposition that each substantive conviction can support a separate § 924(c) charge, two defendants were each charged with four § 924(c) violations for a series of events where four distinct acts gave rise to four separate crimes. In *United States v. Nabors,* 901 F.2d 1351, 1357–58 (6th Cir.1990), the defendant used weapons in his home for the purpose of trafick- ing drugs and used a weapon to shoot a Federal Bureau of Alcohol, Tobacco, and Firearms Agent who entered the apartment to execute a search warrant; two § 924(c) convictions resulted from these distinct uses of firearms. *See also United States v. Romero,* 122 F.3d 1334 (10th Cir.1997) (upholding two § 924(c) convictions for distinct conduct of carjacking and robbery); *United States v. Casiano,* 113 F.3d 420 (3d Cir.1997) (upholding two § 924(c) convictions for distinct conduct of carjacking and kidnaping); *United States v. Floyd,* 81 F.3d 1517 (10th Cir.1996) (same).

ed in *Anderson*, we vacate one of Louis's § 924(c) convictions.[22]

Accordingly, we affirm the judgments of conviction in all respects, except we reverse the convictions of Marcellus Judd and we vacate one of Louis Wilson's § 924(c) convictions.

**22.** *Deal v. United States*, 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), does not compel a different result. *Deal* addressed the meaning of the word "conviction" in the second clause of § 924(c), which doles out a twenty year sentence for "second or subsequent" convictions. *See id.* at 131–37, 113 S.Ct. 1993. By contrast, the instant case concerns not whether a § 924(c) conviction is second or subsequent, but rather whether more than one § 924(c) conviction can be sustained by Louis's conduct. In *Deal*, the Court assumed that Deal's six robberies could support six § 924(c) convictions. *See id.* at 130–31, 113 S.Ct. 1993. The only remaining issue was whether the five convictions beyond the first could count as second and subsequent convictions for sentencing purposes, and the Court concluded that they could. *See id.* at 137, 113 S.Ct. 1993. *See also, Casiano*, 113 F.3d at 424–25 (two § 924(c) convictions upheld where the defendant carjacked and kidnapped his victim, and thus, as in *Deal*, all convictions beyond the first would count as second or subsequent convictions).